

**U.S. Department of Justice**

**Tax Division**

*Please reply to: Appellate Section*
Facsimile No. (202) 514-8456                                      P.O. Box 502
Telephone No.(202) 514-3361                               Washington, D.C. 20044

MJH:EPD:MSJohnshoy
5-25229
CMN 2024100730                                          July 7, 2025

*By ACMS*
Hon. Catherine O'Hagan Wolfe
Clerk, U.S. Court of Appeals for the
 Second Circuit
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 1007

      Re:   *Mark Buller et ux. v. Commissioner*
               (2d Cir. – No. 24-1557)

Dear Ms. Wolfe:

     Under FRAP 28(j), the Commissioner apprises the Court of two recent, related decisions of the Supreme Court in *Monsalvo Velázquez v. Bondi*, No. 23-929, 604 U.S. ___ (April 22, 2025) and *Riley v. Bondi*, No. 23-1270, ___ U.S.___ (June 26, 2025).

     In *Monsalvo Velázquez*, the Supreme Court agreed that courts of appeals have "statutory jurisdiction" over petitions filed under 8 U.S.C. 1252(a)(1), which discusses and thus implicitly authorizes judicial review. Slip Op. at 7. This analysis strongly supports the Government's argument that a grant of jurisdiction may be implicit. (*See* Ans. Br. 19, 21 & n.3 (citing *Madrigal v. Holder*, 572 F.3d 239, 242 (6th Cir. 2009)).) Just as 8 U.S.C. § 1252(a)(1) is an implicit jurisdictional grant, so too is I.R.C. § 6213(a), which grants the Tax Court its authority to redetermine (*i.e.*, review) the Commissioner's prior deficiency determination. Section 6213(a) did not need to use the word "jurisdiction" to confer jurisdiction.

     In *Riley*, the Supreme Court next held that a time limit for filing a petition that is located in a separate subsection, 8 U.S.C. § 1252(b)(1), is not jurisdictional. Slip Op. at 5, 13-16. But this holding is readily distinguishable because, in *Riley*, the relevant grant of jurisdiction and the

-2-

timing limitation were in different statutory subsections.  In contrast, the first sentence of Section 6213(a) contains both the grant of jurisdiction and the timing limitation—the two are textually intertwined.  *See* I.R.C. § 6213(a) (first sentence).  Thus, while 8 U.S.C. § 1252(b)(1) does not provide a directive to the courts or demarcate a courts' power, Section 6213(a) does both of those things.  Section 6213(a) directs the Tax Court to review the Commissioner's prior deficiency determination but only if a timely petition has been filed.

Furthermore, unlike the provision at issue in *Riley*, Section 6213(a)'s implicit jurisdictional grant is also confirmed by other provisions in the same statutory section as well as other provisions of the Internal Revenue Code, all of which confirm Section 6213(a)'s jurisdictional status.  (*See, e.g.*, Ans. Br. 31-50.)

Sincerely,

/s/ Matthew S. Johnshoy
MATTHEW S. JOHNSHOY
Attorney for the Commissioner

-3-

## CERTIFICATE OF SERVICE

I hereby certify that on July 7, 2025, I electronically filed the foregoing letter with the United States Court of Appeals for the Second Circuit by using the ACMS system, by operation of which all registered users will be served.

/s/ Matthew S. Johnshoy
MATTHEW S. JOHNSHOY
*Attorney*

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MONSALVO VELÁZQUEZ *v.* BONDI, ATTORNEY GENERAL

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

No. 23–929.   Argued November 12, 2024—Decided April 22, 2025

The federal government initiated removal proceedings against petitioner Monsalvo Velázquez, who asked the government to suspend its removal efforts or, alternatively, to permit him to leave the United States voluntarily. The immigration judge concluded Monsalvo was removable but granted him an opportunity to voluntarily depart within 60 days. After the Board of Immigration Appeals rejected his appeal, it granted Monsalvo a new 60-day voluntary departure period. The 60th day fell on Saturday, December 11, 2021. Monsalvo filed a motion to reopen proceedings on Monday, December 13. The Board rejected that motion, concluding that the voluntary departure period had expired on Saturday, and Monsalvo's motion was therefore too late. Monsalvo asked the Board to reconsider that conclusion, but the Board refused. Monsalvo then petitioned for judicial review in the Tenth Circuit. The Tenth Circuit agreed with the Board, holding that the voluntary departure deadline in 8 U. S. C. §1229c(b)(2) refers to calendar days with no extension for deadlines that fall on weekends or holidays.

*Held*:

1. This Court has jurisdiction to review Monsalvo's petition. Under §1252, courts may review "final order[s] of removal" and "all questions of law" arising from them. Monsalvo's petition sought judicial review of a legal question about the meaning of a term in his final removal order—specifically, the meaning of "60 days" for voluntary departure. Although Monsalvo did not challenge his removability, nothing in §1252 requires an individual to press a challenge to one term in a final order of removal just to secure judicial review of another. This Court

Syllabus

rejects the government's argument that a petition must include a challenge to removability to secure judicial review.  Such an interpretation would force litigants to assert meritless claims simply to obtain jurisdiction.  Pp. 6–11.

2. Under §1229c(b)(2), a voluntary-departure deadline that falls on a weekend or legal holiday extends to the next business day.  The Board and the Tenth Circuit understood "days" to bear the ordinary meaning of calendar days, no more or less.  But evidence suggests a specialized meaning in legal settings where the term "days" is often understood to extend deadlines falling on a weekend or legal holiday to the next business day.  When Congress adopts a new law against the backdrop of a "longstanding administrative construction," the Court generally presumes the new provision works in harmony with what came before.  *Haig* v. *Agee*, 453 U. S. 280, 297–298.  Since at least the 1950s, immigration regulations have provided that when calculating deadlines, the term "day" carries its specialized meaning by excluding Sundays and legal holidays (and later Saturdays) if a deadline would otherwise fall on one of those days.  Congress enacted §1229c(b)(2) as part of §304 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) against this consistent regulatory backdrop.  The government concedes that other deadlines in the same section of IIRIRA, such as deadlines for motions to reopen or reconsider, are subject to this rule.  The identical term "days" should be given the same meaning throughout §304, especially when the provisions were enacted at the same time in the same section of the law.

Three principal counterarguments are insufficient to overcome the presumption that §1229c(b)(2) follows the government's own longstanding practice of extending deadlines falling on a weekend or legal holiday to the next business day.  First, the fact that the regulatory definition of "day" applies directly only to regulatory deadlines and not to statutory deadlines like the one found in §1229c(b)(2) is irrelevant.  The question here is not whether a regulation can trump a statute but whether Congress's work in §304 of IIRIRA should be read in light of the government's longstanding regulatory practice.  Second, the argument that Congress intended different treatment for voluntary departure because it selected 60 days rather than adopting a pre-existing regulatory deadline of 90 or 30 days is unpersuasive, as nothing in §304 hints that deadlines should operate differently, and the government itself did not advance this view when promulgating rules to enforce the deadline.  Third, nothing in the text supports the government's proposed distinction between "procedural" and "substantive" deadlines, as §304 does not draw such lines, nor does the regulatory background suggest this distinction.  Pp. 11–18.

88 F. 4th 1301, reversed and remanded.

Cite as: 604 U. S. \_\_\_\_ (2025)          3

Syllabus

GORSUCH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SOTOMAYOR, KAGAN, and JACKSON, JJ., joined. THOMAS, J., filed a dissenting opinion, in which ALITO, J., joined, and in which KAVANAUGH and BARRETT, JJ., joined as to Parts I and II. ALITO, J., and BARRETT, J., filed dissenting opinions, in which KAVANAUGH, J., joined.

Cite as: 604 U. S. ____ (2025)          1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

————

No. 23–929

————

## HUGO ABISAÍ MONSALVO VELÁZQUEZ, PETITIONER *v.* PAMELA BONDI, ATTORNEY GENERAL

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

[April 22, 2025]

JUSTICE GORSUCH delivered the opinion of the Court.

This case poses a question about how to calculate a deadline. Often, the government may detain and deport an individual after properly determining he is unlawfully present in this country. But, under 8 U. S. C. §1229c(b)(2), the government will sometimes delay detention and deportation for up to "60 days" to allow those of "good moral character" to leave the country on their own terms. When it comes to many other deadlines in immigration law, if the final day permitted for taking an action falls on a weekend or legal holiday, the deadline rolls over to the next business day. The question for us is whether §1229c(b)(2)'s 60-day voluntary-departure deadline works that same way.

I

A

Born in Mexico, Hugo Monsalvo Velázquez entered the United States unlawfully as a teenager about 20 years ago. Since then, he has made his life in Colorado. Pet. for Cert. 15. There, he attended high school, some college, and met and married his wife. *Ibid.* The couple has an 11-year-old son and a 10-year-old daughter, both U. S. citizens. *Ibid.*

Opinion of the Court

Mr. Monsalvo and his wife have raised their family in a home they own outside Denver, where he also owns and operates a small business. *Ibid.*

In 2011, the federal government initiated proceedings to remove Mr. Monsalvo from the country. *Velazquez* v. *Garland*, 88 F. 4th 1301, 1303 (CA10 2023). In response, Mr. Monsalvo did not dispute that he had entered the country unlawfully, but he asked the government to suspend its removal efforts because he would face persecution if returned to Mexico. App. to Pet. for Cert. 44a–50a. Alternatively, he sought permission to leave the country voluntarily. *Id.*, at 50a.

That second request was important to him. As a rule, individuals lawfully determined to be deportable from this country are not entitled to leave on their own terms but instead face detention and forcible removal. See *Dada* v. *Mukasey*, 554 U. S. 1, 11 (2008). In certain circumstances, however, the government can afford the option of a "voluntary departure" to those "of good moral character." §1229c(b)(1)(B). When the government extends this option, it effectively makes detention and removal contingent: Officials may detain and remove the individual only if he remains in the country after his voluntary-departure period has expired. Suspending removal in this way can benefit both the government and the individual. For the government, an individual's voluntary departure saves the cost and effort associated with detention and removal. *Id.*, at 11. For the individual, it not only allows him to choose how and when he leaves the country. It also allows him to avoid substantial penalties associated with a forcible removal. *Id.*, at 11–12 (citing §1182(a)(9)(A)).

In 2019, an immigration judge issued a decision in Mr. Monsalvo's case. The judge rejected his claim that he would face persecution if returned to Mexico. But the judge also found Mr. Monsalvo eligible for voluntary departure and

Opinion of the Court

gave him 60 days to leave the country, the maximum allowed by law. App. to Pet. for Cert. 51a. As it happened, the end of that 60-day period fell on a Saturday. So, the judge specified, Mr. Monsalvo's deadline for departing voluntarily would extend to the following Monday. *Id.*, at 70a. Should he fail to leave within that period, the immigration judge further ordered, Mr. Monsalvo would face removal and the penalties associated with it. *Id.*, at 51a.

Mr. Monsalvo responded by appealing to the Board of Immigration Appeals. By regulation, that appeal stayed the immigration judge's order. See 8 CFR §1003.6 (2019); *Dada*, 554 U. S., at 10. On October 12, 2021, the Board issued its own decision. In it, the Board rejected Mr. Monsalvo's argument that he would face persecution in Mexico and gave him a (new) period of "60 days to voluntarily depart" the United States, "the maximum period allowed by" §1229c(b)(2). App. to Pet. for Cert. 40a. If he "fail[ed] to voluntarily depart" within that period, the Board added, he "shall be removed." *Id.*, at 42a. Summing up, the Board explained its disposition this way:

> "ORDER: The respondent's appeal is dismissed.
>
> "FURTHER ORDER: . . . the respondent(s) is (are) permitted to voluntarily depart . . . within 60 days . . . . In the event a respondent fails to voluntarily depart . . . the respondent shall be removed as provided by the Immigration Judge." *Ibid.*

The Board's decision also included two other salient provisions. In one, the Board warned Mr. Monsalvo that he would face serious penalties if he overstayed his voluntary-departure deadline. Those penalties could include not just removal and monetary fines, but also ineligibility for most forms of immigration relief for a period of 10 years. *Id.*, at 42a–43a; 8 U. S. C. §1229c(d)(1). In the other provision, the Board advised Mr. Monsalvo of his right to file a motion to reopen his removal proceedings if he thought he had new

and previously unavailable evidence that could alter the Board's assessment of his case. App. to Pet. for Cert. 43a. If he filed such a motion *before* the expiration of his 60-day voluntary-departure period, the Board continued, the penalties associated with failing to depart would "not apply." *Ibid.*; 8 CFR §1240.26(b)(3)(iii) (2021).

### B

Consistent with the Board's direction, Mr. Monsalvo filed a motion to reopen. On Friday, December 10, 2021, his attorney served the government with a copy and sent the original to the Board using an overnight delivery service. Brief for Petitioner 12. On the following Monday, December 13, 2021, the Board accepted the motion for filing. *Ibid.* The motion drew the Board's attention to this Court's then-recent decision in *Niz-Chavez* v. *Garland*, 593 U. S. 155 (2021), and argued that, under its terms, Mr. Monsalvo was entitled to have his order of removal canceled. Brief for Petitioner 12.

The Board denied the motion to reopen for two reasons. First, it held that *Niz-Chavez* did not justify reopening Mr. Monsalvo's removal proceedings. App. to Pet. for Cert. 37a. Second, and without prompting from the government, the Board held that his motion to reopen had arrived too late. *Id.*, at 38a.

The Board's second holding rested on an interpretation of §1229c(b)(2)'s voluntary-departure deadline. The Board began by observing that it had given Mr. Monsalvo "60 days" to depart voluntarily, the maximum allowed by §1229c(b)(2). Interpreting that statute, the Board read its use of the term "days" to refer to calendar days. Here, that meant Mr. Monsalvo's voluntary-departure period began on October 12, 2021, when the Board issued its removal order, and expired on Saturday, December 11, 2021. The Board did not question that Mr. Monsalvo *served* his motion to reopen the day before, on Friday, December 10, 2021. But,

the Board stressed, the motion was not *filed* until the following business day, Monday, December 13, 2021. And, as the Board saw it, that created a problem. Because Mr. Monsalvo had neither left the country nor filed a motion to reopen before the expiration of his voluntary-departure period, the Board said, the penalties it had previously warned Mr. Monsalvo about now applied. See *supra,* at 2. Accordingly, the Board held, it was powerless to entertain his motion—or nearly any request for immigration relief he might wish to pursue for the next decade. App. to Pet. for Cert. 38a (citing §1229c(d)); see also *id.*, at 43a.

Mr. Monsalvo filed a motion asking the Board to reconsider this second holding. Pet. for Cert. 19. His reason for focusing on it was obvious. Not only did that holding prevent him from seeking to reopen his case; the Board's reasoning had the potential to foreclose for years almost any avenue of lawful immigration relief he might hope to pursue. Addressing the Board's holding, Mr. Monsalvo argued that it misconstrued §1229c(b)(2). As a matter of law, he submitted, that statute operates to extend any deadline that falls on a weekend or legal holiday to the next business day. The immigration judge handling his case had understood §1229c(b)(2) to work just this way. See *supra*, at 3; App. to Pet. for Cert. 70a. And under that view of the law, Mr. Monsalvo contended, his voluntary-departure deadline did not expire until Monday, December 13, 2021. As a result, his motion to reopen was timely filed that same day, and the penalties associated with failing to file a motion to reopen or to depart voluntarily did not apply. See 88 F. 4th, at 1305. Ultimately, however, the Board disagreed, stood by its earlier decision, and denied Mr. Monsalvo's motion for reconsideration. *Ibid.*

### C

Having failed before the agency, Mr. Monsalvo turned to court, petitioning the Tenth Circuit to review the Board's

order denying his motion for reconsideration. §1252(a)(1). But that effort failed too. Like the Board, the Tenth Circuit thought that the provision in his final order of removal granting him "60 days" to depart voluntarily was "[c]onclusively . . . governed by" §1229c(b)(2). *Id.*, at 1308. And, like the Board, the court read the statute as speaking in terms of "calendar days." *Id.*, at 1303. From this, the court reasoned, it followed that Mr. Monsalvo's voluntary-departure deadline expired on Saturday, December 11, 2021, and his failure to file a motion to reopen or to depart voluntarily by that date made it impossible for the Board to entertain either his motion or perhaps any other application from him for years. *Id.*, at 1309–1310.

We agreed to take up the case because the Tenth Circuit's interpretation of §1229c(b)(2) opened a circuit split. 603 U. S. ___ (2024). While the Tenth Circuit has construed the statute to afford an individual no more than 60 calendar days to leave the country voluntarily, the Ninth Circuit has read it to extend a deadline falling on a weekend or legal holiday to the next business day. See *Meza-Vallejos* v. *Holder*, 669 F. 3d 920 (2012). Who is right on this question of statutory interpretation matters greatly to people like Mr. Monsalvo. Not only does it affect the time one may have to reopen immigration proceedings. As we have seen, it also affects an individual's exposure to detention, removal, and fines, and carries with it serious ramifications for his ability to seek lawful status for years into the future. §§1229c(d)(1), 1182(a)(9); 8 CFR §1240.26(a).

## II

Before we can address that question, however, we must attend to an antecedent one. In the Tenth Circuit, the government argued that court lacked statutory jurisdiction to entertain Mr. Monsalvo's petition. Here, the government renews its claim. On its view, we cannot pass on who has the better reading of §1229c(b)(2), but must instead vacate

Opinion of the Court

the Tenth Circuit's judgment and remand Mr. Monsalvo's petition to that court with instructions to dismiss it. See Brief for Respondent 15–20.

A

The Tenth Circuit's jurisdiction hinged on §1252(a)(1). That provision allows an individual to petition for "[j]udicial review of a final order of removal" in the appropriate court of appeals. *Ibid.* Such a petition supplies the exclusive means for obtaining "[j]udicial review of all questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien from the United States." §1252(b)(9).

The Tenth Circuit held that it had statutory jurisdiction to consider Mr. Monsalvo's petition, and we agree. On October 12, 2021, the Board issued an order which petitioner contends, and the government does not dispute, constituted a final order of removal. See App. to Pet. for Cert. 42a–43a; Reply Brief 5; Tr. of Oral Arg. 37–38, 64–65. That order conditionally authorized Mr. Monsalvo's detention and removal, providing that "[i]n the event" he failed to leave voluntarily "within 60 days," the "maximum permitted period allowed by" §1229c(b)(2), authorities could detain and "remov[e]" him. App. to Pet. for Cert. 40a, 42a; *supra,* at 3. In later administrative proceedings, the parties disagreed about what that order meant. The government read §1229c(b)(2), and thus the order, as affording Mr. Monsalvo 60 calendar days before authorities could detain and remove him—and thus before his time to file a motion to reopen effectively expired. Mr. Monsalvo interpreted the statute, and thus his order, to extend his 60-day deadline, which fell on a weekend, to the next business day. Mr. Monsalvo's petition to the Tenth Circuit asked that court to resolve the parties' dispute. Or, to put it in §1252's terms, he asked the court to review his "final order of removal" and

address a "questio[n] of law . . . arising from" its terms. Exactly as the law allows.

It is true that Mr. Monsalvo did not seek judicial review immediately after the Board entered its final order of removal. But, at that stage, he had no reason to do so. The Board had given him "60 days" to leave the country, and the immigration judge had already explained to him that a voluntary-departure deadline falling on a weekend rolls over to the next business day. *Supra*, at 2, 3. The dispute over the meaning of "60 days" arose only later, when, in ruling on his motion to reopen and without prompting from the government, the Board held that his voluntary-departure deadline expired on a Saturday. See *supra*, at 4; App. to Pet. for Cert. 38a. Understandably, Mr. Monsalvo asked the Board to reconsider that conclusion before he proceeded to court, giving the agency in the first instance the chance to address his argument that the phrase "60 days" in §1229c(b)(2) and his order of removal extends a deadline falling on a weekend or legal holiday to the next business day. See *supra*, at 4. It was only after the Board rejected that view that he required judicial intervention. And nothing prevented him from seeking it in a challenge to the Board's reconsideration order, for that order expressly interpreted a term in his final order of removal and Mr. Monsalvo's judicial petition contested that interpretation as a matter of law.

B

The government does not dispute that Mr. Monsalvo presented the Tenth Circuit with a legal question about how long he had to depart before facing removal. See Brief for Respondent 18–20. But, the government insists, §1252(a)(1) requires more. To secure judicial review, the government says, an individual must include in his petition some challenge to his "removability" from this country. *Ibid.* And because Mr. Monsalvo's petition didn't do that,

but pressed only a question about his voluntary-departure deadline, the court was powerless to hear his case.

To be sure, the government emphasizes, things could have worked out differently for Mr. Monsalvo. All he had to do, the government says, was bundle his question about the operation of his voluntary-departure deadline with some challenge to the Board's conclusion that he was removable. *Id.*, at 20. So, for example, in addition to asking the Tenth Circuit to review the Board's order denying his motion for *reconsideration* (and rejecting his interpretation of §1229c(b)(2)), he could have asked for review of the Board's order denying his motion to *reopen* (and concluding he was not entitled to have his removal canceled). Had he done that, the government assures us, the Tenth Circuit would have had jurisdiction over his petition and could have addressed both questions. *Id.*, at 20.

The government does not deny that, under its view, some people will have to "make up a completely meritless claim in order to get jurisdiction." Tr. of Oral Arg. 57–58. By the conclusion of administrative proceedings, individuals like Mr. Monsalvo may no longer think they have a viable challenge to their removability, only some other colorable and consequential question about their final orders of removal. But, as the government sees it, they cannot simply bring that live question to court. They must either adorn their judicial petitions with a pointless challenge to their removability or forfeit the right to review altogether.

We see nothing in §1252 that puts litigants to that kind of choice. The statute does not say that an individual must press a challenge to one term in a final order of removal (a finding of "removability") just to secure judicial review of another (like a voluntary-departure deadline). In fact, the word "removability" does not even appear in the statute. Instead, §1252 authorizes courts to review "final order[s] of removal" and address "questions of law . . . arising from"

them. §§1252(a)(1), (b)(9). And pretty plainly, that language permits a court to review *all* terms in a final order of removal without anything like the qualification the government imagines.

Our dissenting colleagues see things differently. In their view, this Court's decision in *Nasrallah* v. *Barr*, 590 U. S. 573 (2020), requires us to adopt the government's jurisdictional theory. See *post*, at 8–10 (opinion of THOMAS, J.); *post*, at 2 (opinion of BARRETT, J.). But, if anything, that case supports our conclusion. *Nasrallah* described a "final order of removal" subject to judicial review as a final order "'concluding that the alien is deportable or ordering deportation.'" 590 U. S., at 581. And (again) that is exactly what we have here: a final order specifying that the government may remove Mr. Monsalvo if he fails to depart voluntarily within 60 days, and a petition asking the courts to settle a dispute over what that order means.

JUSTICE THOMAS highlights *Nasrallah*'s holding that a Board order denying relief under the Convention Against Torture (CAT) in that case was "not part of the removal order." *Post*, at 9 (dissenting opinion). But we fail to see the relevance of that holding to this case. A CAT order provides that, "notwithstanding" a removal order, the government may not remove an individual to a particular "designated country." *Nasrallah*, 590 U. S., at 582. CAT orders, moreover, have a distinct statutory basis from removal orders, and different statutes govern their review. *Id.*, at 579–580. No such order is in play here. Mr. Monsalvo has not sought judicial review of a CAT order, only review about the meaning of his final order of removal.

JUSTICE BARRETT, for her part, reads *Nasrallah* as suggesting that an individual like Mr. Monsalvo may not challenge the Board's interpretation of a term in his removal order. Instead, he may ask a court only to change or excise a term in his removal order. See *post*, at 2 (dissenting opin-

Opinion of the Court

ion). But *Nasrallah* held nothing of the kind. Nor is it possible to square such a view with the statutory text. Section 1252 permits individuals to petition for judicial review of "final orders of removal" and indicates that those petitions supply the exclusive means for securing "[j]udicial review of all questions of law." §1252(b)(9). Nothing in the statutory text contains anything like the limitation the dissent supposes, permitting judicial review of only certain *kinds* of legal errors.[1]

### III
### A

That takes us to the merits. The Board's final order of removal permitted the government to detain and remove Mr. Monsalvo if he failed to leave the country within "60 days . . . the maximum period allowed by" §1229c(b)(2). App. to Pet. for Cert. 40a. Everyone agrees the proper construction of that order is "governed by" the proper construction of §1229c(b)(2). 88 F. 4th, at 1308. Like Mr. Monsalvo's final order of removal, that statute sets forth a deadline expressed in terms of a number of "days." See §1229c(b)(2)

---

[1] Separately, the dissents suggest that we should remand this case to the Tenth Circuit to address the government's "late-breaking" jurisdictional objection. *Post*, at 6 (opinion of THOMAS, J.); see also *post*, at 3 (opinion of BARRETT, J.). But the government's objection is not a new one—it has challenged statutory jurisdiction throughout the life of this litigation, even if it has pursued various and shifting theories to support its objection. See Brief for Respondent in No. 22–9576 (CA10), pp. 36–38; Brief for Respondent 15–20. Nor do the dissenters dispute that this Court may "dispose of . . . recently raised jurisdictional argument[s]." *Caraco Pharmaceutical Laboratories, Ltd.* v. *Novo Nordisk A/S*, 566 U. S. 399, 412, n. 5 (2012).

Separately still, JUSTICE THOMAS suggests that we have developed an argument for jurisdiction that Mr. Monsalvo did not present. See *post*, at 13 (dissenting opinion). That charge is mistaken. Our analysis here tracks Mr. Monsalvo's contention that his case satisfies §1252 because he sought judicial review of the Board's "resolution of the disputed timeliness issue," which turned on the "terms of [his] final removal order." Reply Brief 4–5.

("Permission to depart voluntarily under this subsection shall not be valid for a period exceeding 60 days"). But what does that mean: Does every calendar day count? Or does the statute operate to extend a deadline that falls on a weekend or legal holiday to the next business day?

In truth, the statute is susceptible to both understandings. An ordinary reader might understand "days" to mean calendar days, no more or less. That is how the Board and the Tenth Circuit saw it. See *supra*, at 4–5. And, to be sure, we usually assume statutory terms bear their ordinary meaning "until and unless someone points to evidence suggesting otherwise." *Niz-Chavez*, 593 U. S., at 163. But here, evidence suggesting the possibility of specialized meaning does exist. In legal settings, the term "days" is often understood to extend deadlines falling on a weekend or legal holiday to the next business day. Various federal rules reflect this understanding. See, *e.g.,* Fed. Rule Civ. Proc. 6(a)(1)(C). As do our own. See this Court's Rule 30(1). The Ninth Circuit and the immigration judge in this case thought §1229c(b)(2) of a piece with that practice. See *supra,* at 2, 5. The question before us thus boils down to whether §1229c(b)(2) uses the term "days" in its ordinary or specialized sense.

To resolve that question, we turn to one of this Court's customary interpretive tools. When Congress adopts a new law against the backdrop of a "longstanding administrative construction," this Court generally presumes the new provision should be understood to work in harmony with what has come before. *Haig* v. *Agee*, 453 U. S. 280, 297–298 (1981); accord, *United States* v. *Hill*, 506 U. S. 546, 553–554 (1993); *FDIC* v. *Philadelphia Gear Corp.*, 476 U. S. 426, 437 (1986).

That presumption is all but dispositive here. For many years, Congress has authorized the executive branch to draw up regulations to enforce the immigration laws. See 8 U. S. C. §1103(a)(3). And since at least the 1950s, those

Opinion of the Court

regulations have provided that, when calculating the deadline for the "taking of *any action*," the term "day" carries its specialized meaning by excluding Sundays and legal holidays if a deadline would otherwise fall on one of those days. 8 CFR §1.1(a)(6) (1958) (emphasis added). In all the years since, the only notable change to this rule has been the addition of Saturdays to the list of excluded days. 52 Fed. Reg. 2935 (1987). Congress adopted §1229c(b)(2) against the backdrop of this consistent, longstanding administrative construction. And, given that, we presume the statute employs the same understanding.[2]

Nor do we see anything in the statute that might overcome our usual presumption. To the contrary, what evidence we have before us only supports its application. Congress set forth the maximum number of "days" allowed for voluntary departure in §304 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA). In the same section of that law, Congress also provided individuals a certain number of "days" to file motions to reopen or to reconsider. §304, 110 Stat. 3009–593; 8 U. S. C. §§1229a(c)(6)(B), (c)(7)(C)(i). When it comes to those latter provisions, the government concedes, the term "days" is best read in light of pre-existing regulatory practice and thus takes its specialized meaning. Brief for Respondent 43–44. Everyone agrees, then, that two provisions in §304 operate to roll a deadline falling on a weekend or legal holiday over to the next business day. And if two provisions in a single section of an Act of Congress use the term "days" this way, it is all the more sensible to think a third provision in the same section does as well. After all, "identical words and phrases within the same statute should normally be given the same meaning." *Powerex Corp.* v. *Reliant Energy*

─────────

[2] Though §1229c(b)(2) uses the plural "days," and the regulation uses the singular "day," no one before us has suggested that distinction makes a difference. Cf. 1 U. S. C. §1 ("[W]ords importing the plural include the singular," and vice versa).

14          MONSALVO VELÁZQUEZ *v.* BONDI

Opinion of the Court

*Services, Inc.*, 551 U. S. 224, 232 (2007). And, if anything, that maxim may be "doubly appropriate" where, as here, Congress employed the same term in multiple places "at the same time" in the "same section of the [same] public law." *Id.*, at 231–232.

Tellingly, too, if Congress meant to depart from settled immigration practice when it adopted the voluntary-departure deadline in 1996, the government itself seems not to have noticed. After Congress enacted IIRIRA, the government promulgated a new rule to enforce §1229c(b)(2)'s terms. See 62 Fed. Reg. 10312, 10372 (1997). Tracking the statute, that rule allows an immigration judge to grant a voluntary-departure period of up to "60 days." 8 CFR §240.26(e) (1999). And under the government's own regulations, remember, regulatory deadlines defined in terms of days do not expire on weekends or legal holidays. §1001.1(h) (2021). Nowhere does the government's rule enforcing §1229c(b)(2) suggest that it is exempt from these regulations.[3] Perhaps for this reason, the immigration judge in Mr. Monsalvo's own case understood his voluntary-departure deadline to extend past a weekend to a Monday. See *supra,* at 3. Perhaps for this reason, as well, many other immigration judges have done the same in other cases. See Brief for American Immigration Lawyers Association as *Amicus Curiae* 4 (collecting examples).

B

In response to our merits analysis, the government and

---

[3] JUSTICE ALITO notes that the government's rule provides that "'the total period of time [to voluntarily depart shall not exceed] 60 days *as set forth in section 240B of the Act*.'" *Post*, at 10, n. 3 (dissenting opinion) (quoting 8 CFR §1240.26(f) (2024)). But we fail to see how the language he emphasizes moves the needle. As we have seen, the relevant section of the Act does not define "days." Meanwhile, the government's own rules instruct that regulatory deadlines like this one should be construed consistent with the specialized meaning of the term "day." Nor does anything in this regulation disavow that approach.

Opinion of the Court

JUSTICE ALITO offer three principal counterarguments. But, thoughtful as they are, we find none sufficient to overcome the presumption that §1229c(b)(2) follows the government's own longstanding practice.

First, the government and JUSTICE ALITO stress the limited reach of the regulation defining the term "day." Yes, they admit, that rule has long indicated that deadlines expressed in days do not expire on weekends or legal holidays. And yes, they agree, the definition applies for "computing the period of time for taking *any action* provided in this chapter." 8 CFR §1.1(h) (1996) (emphasis added). But, they observe, that rule applies only to regulatory deadlines and does not purport to control statutory deadlines like the one found in §1229c(b)(2). Brief for Respondent 43; *post*, at 4 (dissenting opinion).

That much is true, but also irrelevant. The question before us isn't whether a regulation can trump a statute (of course not). It is whether Congress's work in §304 of IIRIRA should be read in light of the government's longstanding regulatory practice. And, again, even the government concedes that the answer is (mostly) yes. *Supra*, at 12. When speaking of the "days" available for filing motions to reopen or to reconsider in §304, the government admits, Congress meant to follow the pre-existing regulatory practice rolling over deadlines falling on weekends and legal holidays to the next business day. Brief for Respondent 43–44. Nothing in the government's argument here supplies a reason to suppose Congress meant the term "days" to work differently when it comes to the voluntary-departure deadline found in the same section of IIRIRA.[4]

_____

[4] JUSTICE ALITO questions our reliance on the government's concession that the specialized meaning of "days" applies to other deadlines in §304 of IIRIRA. See *post*, at 7–8 (dissenting opinion). But our colleague does not dispute the correctness of that concession and, in the end, seems to embrace it. See *post*, at 6, 9 (endorsing the specialized meaning of "days" for §304's "filing" deadlines).

Second, and attempting to address this deficiency, the government and JUSTICE ALITO highlight the fact that, when setting the deadlines for motions to reopen or to reconsider in §304, Congress codified pre-existing deadlines found in immigration regulations (90 days and 30 days, respectively). By contrast, when Congress selected 60 days as the voluntary-departure deadline, it did not pull that number from a pre-existing regulatory deadline. Given that difference, the argument goes, Congress must have meant the word "days" to work differently when it comes to the voluntary-departure deadline alone. Brief for Respondent 43–44; *post*, at 9–10 (dissenting opinion).

That conclusion, however, does not follow from its premise. Exactly nothing in §304 hints that deadlines found there should operate differently. Nor does the regulatory backdrop against which Congress legislated. Recall that, by 1996, the government's regulations had long provided—categorically and without exception—that the term "day" excludes certain weekends and legal holidays when it comes to calculating the deadline for "taking *any action*," of whatever kind, required by regulation. 8 CFR §1001.1(h) (emphasis added). Again, too, if Congress meant to pursue a more parsimonious approach for the voluntary-departure deadline in §304, it is curious that the government itself did not seem to advance that view when it promulgated its own rule to enforce that deadline. See 8 CFR §1240.26(e); *supra*, at 14, and n. 3.

Third, coming at the problem from a different direction, the government and JUSTICE ALITO suggest that we should divide §304's deadlines into "procedural" and "substantive" categories. Brief for Respondent 15, 22; *post*, at 4, 6, 9 (dissenting opinion). For "procedural" deadlines, like those for motions to reopen and reconsider, the government and dissent concede, it makes sense to think Congress legislated against the administrative backdrop we have described, given that the agencies and courts where those motions

Opinion of the Court

must be filed are usually closed on weekends and legal holidays. But that consideration is immaterial, the government and JUSTICE ALITO insist, for the "substantive" duty of voluntary departure. After all, an individual can leave the country almost anytime; even if agencies and courts close for the weekend or a legal holiday, airports and roads generally remain open.

Maybe the procedural/substantive distinction the government and dissent propose would make for good policy. But if Congress had something like that in mind, it never said so. Section 304's text does not draw any lines between procedural and substantive duties. Nor does the regulatory background against which the statute was adopted hint at such a distinction. As we have seen, the government's longstanding definition of the term "day" excludes certain weekends and holidays when calculating the time for taking "any action" under immigration regulations—including when it comes to various "substantive" actions that can plainly be accomplished on a weekend or holiday, like "getting married after entering the United States on a fiancé(e) visa." Brief for Petitioner 38. Notably, as well, the government's own regulations enforcing §304 make no mention of a procedural/substantive distinction either. *Supra,* at 11–12.

Perhaps, too, Congress had good reason for eschewing the line the government and dissent would have us draw. Often enough, as it happens, a "substantive" duty that can be performed on any given day will be intertwined with a "procedural" duty that can be discharged only on days when agencies and courts are open. Mr. Monsalvo's case reflects this reality. In it, the effective (procedural) deadline for his motion to reopen turned on the calculation of the (substantive) deadline for voluntary departure. See *supra,* at 4. In light of that reality, a rational Congress might have thought it sensible to extend the same rule to both the procedural and substantive deadlines in §304. Of course, whether anyone

in Congress gave so much as a passing thought to questions like that is anyone's guess. But one thing is certain: The statutory text Congress chose in §1229c(b)(2) shows no more sign of a procedural/substantive distinction than the government's own longstanding rules.[5]

\*

As we see it, §1229c(b)(2)'s deadline works like others found in §304 of IIRIRA—and so many others in immigration law. Here, as elsewhere, the term "days" operates to extend a deadline that falls on a weekend or legal holiday to the next business day. Because the Tenth Circuit held otherwise in addressing Mr. Monsalvo's petition, its judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

_____

[5] Briefly advancing a separate argument that the government has not advanced for itself, JUSTICE ALITO suggests that the specialized meaning of "days" cannot be applied sensibly to *other* deadlines governing, for example, how long an "alien crewman" may remain in this country. *Post*, at 5–6 (dissenting opinion (discussing 8 U. S. C. §1282(a)). But, as we have sought to stress, different statutes passed at different times against different regulatory backdrops may bear different meanings, and all we address today is the meaning of §1229c(b)(2).

Cite as: 604 U. S. ____ (2025)          1

THOMAS, J., dissenting

# SUPREME COURT OF THE UNITED STATES

_____

No. 23–929
_____

## HUGO ABISAÍ MONSALVO VELÁZQUEZ, PETITIONER *v.* PAMELA BONDI, ATTORNEY GENERAL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE TENTH CIRCUIT

[April 22, 2025]

JUSTICE THOMAS, with whom JUSTICE ALITO joins, and with whom JUSTICE KAVANAUGH and JUSTICE BARRETT join as to Parts I and II, dissenting.

This Court granted certiorari to decide whether the deadline for a removable alien to voluntarily depart the United States extends to the next business day if it would otherwise fall on a weekend or public holiday. See 8 U. S. C. §1229c(b)(2). But, the merits-stage briefing revealed a serious, novel jurisdictional objection that may bar our review. Given that complication, we should have vacated and remanded for the Tenth Circuit's consideration in the first instance. Instead, the majority reaches the merits after finding jurisdiction based on a flawed theory of its own creation. I respectfully dissent.

## I

The Immigration and Nationality Act (INA), 66 Stat. 163, 8 U. S. C. §1101 *et seq.*, "governs how persons are admitted to, and removed from, the United States." *Pereida* v. *Wilkinson*, 592 U. S. 224, 227 (2021). In 1996, Congress enacted "comprehensive amendments" to the INA through the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), 110 Stat. 3009–546. *INS* v. *St. Cyr*, 533 U. S. 289, 292 (2001). This case concerns two of IIRIRA's re-

forms: its imposition of strict deadlines for voluntary departure, and its curtailment of an alien's right to judicial review.

## A

"Voluntary departure" is a discretionary form of immigration relief under which "certain favored aliens" can "leave the country willingly," in lieu of deportation. *Dada* v. *Mukasey*, 554 U. S. 1, 8 (2008). This relief strikes a bargain between the Government and eligible aliens. The Government saves time and money by shifting the costs of departure onto the alien. In exchange, the alien retains some control over the timing and destination of his departure and escapes the penalties that follow formal deportation. *Ante*, at 2.

IIRIRA tightened this bargain by "curtail[ing] the period of time during which an alien may remain in the United States pending voluntary departure." *Dada*, 554 U. S., at 9. Gone are the days when aliens permitted to voluntarily depart could "'continue their illegal presence in the United States for months, and even years.'" *Ibid.* Now, a voluntary-departure period granted at the end of an alien's removal proceedings cannot "excee[d] 60 days." §1229c(b)(2). Aliens who fail to timely depart face stringent penalties, including a 10-year period of ineligibility for various forms of immigration relief. §1229c(d)(1); *ante*, at 3.

To enforce the voluntary-departure deadline, the immigration judge (IJ) or Board of Immigration Appeals (BIA) must enter an "alternate order of removal" alongside any grant of voluntary departure. 8 CFR §§1240.26(d), (k)(1) (2024). That order goes into effect automatically if an alien does not depart by the deadline.

IIRIRA also permits an alien to give up his grant of voluntary departure and pursue other administrative relief. *Dada*, 554 U. S., at 21. The alien may at any time before

THOMAS, J., dissenting

his voluntary-departure deadline move to reopen his removal proceedings or move for reconsideration of his case. §1240.26(e)(1). If the alien acts before the deadline, then his motion will "automatically terminat[e] the grant of voluntary departure" and cause the "alternate order of removal [to] take effect," but the alien will not be subject to the penalties for failure to timely depart. §§1240.26(c)(3)(iii), (e)(1). If the deadline "has already expired," however, then a filing "does not in any way impact the period of time allowed for voluntary departure" or, outside an exception not relevant here, the penalties for failing to timely depart. §1240.26(e)(2).

## B

Beyond its substantive constraints, IIRIRA also "instituted a new" and "significantly more restrictive" scheme for judicial review. *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U. S. 471, 475 (1999) (*AADC*). That scheme makes the "final order of removal" the linchpin of an alien's right to judicial review. 8 U. S. C. §1252.

A final order of removal is "a final order 'concluding that the alien is deportable or ordering deportation.'" *Nasrallah* v. *Barr*, 590 U. S. 573, 579 (2020) (quoting §1101(a)(47)(A)). Under §1252, an alien can obtain judicial review of such an order by filing a petition for review in a federal court of appeals. §1252(a)(1). That section also makes review of "all questions of law and fact" arising from an alien's removal proceedings available "only in judicial review of a final order" of removal, unless there is an independent jurisdictional basis. §1252(b)(9).

Our precedents have interpreted §1252 to permit judicial review only of the final order of removal itself and two closely related categories of orders. *First*, "rulings that affect the validity of the final order of removal," such as an IJ's evidentiary rulings, "merge into the final order of removal for purposes of judicial review." *Id.*, at 582. *Second*,

THOMAS, J., dissenting

certain rulings that have an independent jurisdictional basis, such as an order regarding Convention Against Torture (CAT) relief, "may be reviewed together with the final order of removal." *Id.,* at 582–583, 585. Beyond these categories, however, the federal courts lack jurisdiction over removal-related determinations. See *Reyes Mata* v. *Lynch,* 576 U. S. 143, 147 (2015).

C

Petitioner Hugo Monsalvo Velázquez is an alien who was granted voluntary departure at the end of his removal proceedings. Before the IJ, he conceded removability but sought CAT relief or withholding of removal based on an alleged risk of future persecution. He asked for voluntary departure in the alternative. The IJ granted only voluntary departure, while also entering the requisite alternate order of removal. On appeal, the BIA reset the voluntary-departure period after it affirmed the IJ's denial of other relief.

The BIA set Monsalvo's new voluntary-departure period to run for the 60 days following its decision, which issued on October 12, 2021. Measured by calendar days, a 60-day period would end on Saturday, December 11, 2021.

On Friday, December 10, 2021, Monsalvo submitted a motion to reopen his removal proceedings via overnight delivery service. The motion asserted that, following this Court's decision in *Niz-Chavez* v. *Garland,* 593 U. S. 155 (2021), Monsalvo was newly eligible for cancellation of removal. Pursuant to a BIA policy not challenged here, this after-hours motion was not deemed filed until Monday, December 13, 2021, when the BIA was next open to receive filings. See BIA Practice Manual §3.1(a)(1), https://www.justice.gov/eoir/reference-materials/bia.

The BIA denied Monsalvo's motion both on the merits of his *Niz-Chavez* claim and based on the timing of his filing. On its view, "[t]he 60-day period of voluntary departure terminated on December 11, 2021." App. to Pet. for Cert. 38a.

Cite as: 604 U. S. ____ (2025)          5

THOMAS, J., dissenting

Because Monsalvo had failed to depart by that deadline, his December 13 reopening motion came when he was already subject to IIRIRA's penalties for failing to timely depart, including "ineligibil[ity] for . . . cancellation of removal." *Ibid.* Thus, Monsalvo was ineligible for his requested relief.

After Monsalvo moved for reconsideration of only the timing holding, the BIA reaffirmed its position. "[N]o provision[,] statute[,] or regulation extend[s] the last day of the voluntary departure period f[a]lling on a weekend or a legal holiday to the next business day," it explained, so 60 days means 60 calendar days. *Id.*, at 34a–35a.

Monsalvo petitioned the Tenth Circuit for review of the BIA's reconsideration ruling. He argued that, when the voluntary-departure deadline would otherwise fall on a weekend or holiday, it rolls over to the next business day. In deciding his petition, the Tenth Circuit first rejected the Government's arguments for why it lacked statutory jurisdiction under §1252 to review the petition. On the merits, the court ruled for the Government, agreeing with the BIA that 60 days means 60 calendar days.

We granted certiorari to review the Tenth Circuit's merits holding. 603 U. S. ___ (2024). But, since then, much of the briefing—and our focus at oral argument—has centered on the threshold issue of statutory jurisdiction.

The Government raised before this Court a new objection to the Tenth Circuit's jurisdiction: that Monsalvo's petition could not support jurisdiction because it did not bear on his removability. The Government emphasized that Monsalvo had asked the Tenth Circuit to review only the denial of his motion for reconsideration, which, unlike his motion for reopening, did *not* ask the BIA to reopen his removal proceedings. Accordingly, he was asking only "to alter a nondispositive portion of the Board's reasoning in its prior decision declining to reopen proceedings." Brief for Respondent 19. That unusual request, the Government contended, did not fall into any category cognizable under §1252.

6                    MONSALVO VELÁZQUEZ *v.* BONDI

                        Thomas, J., dissenting

                              II

In view of the Government's serious, late-breaking juris-
dictional objection, we should have vacated and remanded
for the Tenth Circuit's review.  Although "[o]bjections to a
tribunal's jurisdiction can be raised at any time," *Sebelius*
v. *Auburn Regional Medical Center*, 568 U. S. 145, 153
(2013), we need not resolve a belated objection ourselves.

Our "usual practice" is to refrain from deciding "legal . . .
questions in the first instance." *CRST Van Expedited, Inc.*
v. *EEOC*, 578 U. S. 419, 435 (2016).  "[W]e are a court of
review, not of first view." *Cutter* v. *Wilkinson*, 544 U. S.
709, 718, n. 7 (2005).  Accordingly, we ordinarily wait to see
if "the crucible of adversarial testing . . . , along with the
experience of our thoughtful colleagues on the district and
circuit benches, [can] yield insights (or reveal pitfalls) we
cannot muster guided only by our own lights." *Maslenjak*
v. *United States*, 582 U. S. 335, 354 (2017) (Gorsuch, J.,
concurring in part and concurring in judgment).

This Court has routinely vacated and remanded cases so
that lower courts can be the first to address significant new
developments. *Zubik* v. *Burwell*, 578 U. S. 403, 408–409
(2016) (*per curiam*) (collecting cases).  In a number of cases,
we have taken this course based on emergent jurisdictional
matters specifically.  See, *e.g.*, *Frank* v. *Gaos*, 586 U. S. 485,
488, 492–493 (2019) (*per curiam*); *Insurance Co. of Pa.* v.
*Ben Cooper, Inc.*, 498 U. S. 964 (1990).

I would do the same here.  Not only was the jurisdictional
issue before us not raised below, but until this point it has
not been passed upon by *any* court.  Tr. of Oral Arg. 12, 67.[1]

Caution  is  also  especially  important  for  jurisdictional
matters.  "Congress' power over federal jurisdiction is 'an

───────────

    [1]The majority cannot sidestep the novelty of the jurisdictional issue
before us by highlighting that the Government raised other objections to
statutory jurisdiction below. *Ante*, at 11, n. 1.  The point remains that
the Government did not raise, and the Tenth Circuit had no opportunity
to consider, the important objection contested before this Court.

THOMAS, J., dissenting

essential ingredient of separation and equilibration of powers, restraining the courts from acting at certain times, and even restraining them from acting permanently regarding certain subjects.'" *Patchak* v. *Zinke*, 583 U. S. 244, 254 (2018) (plurality opinion) (quoting *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 101 (1998)). When we assume jurisdiction too hastily, we risk aggrandizing ourselves at the expense of the political branches.

There is no reason for the Court's intervention today. We did not grant certiorari to address jurisdiction, and—as its novel status reflects—the jurisdictional question plainly is not so pressing as to require immediate resolution. Nor is the underlying question presented so important as to require resolution in this case. That question too arises only rarely: As the Tenth Circuit recognized, its decision below resolved "an issue of first impression in th[at] court," which had been "addressed before by only one other circuit." *Velazquez* v. *Garland*, 88 F. 4th 1301, 1305 (2023).

Of course, we should not hesitate to brush aside baseless jurisdictional objections. But, the issue here cannot be dismissed on that ground. The Government has raised a serious objection based on the tension between §1252's removal-focused jurisdictional framework and Monsalvo's choice to seek review only of a claim unrelated to removability. We should not be "the first"—and only—"court in the Nation" to address that tension. *Yee* v. *Escondido*, 503 U. S. 519, 538 (1992).

III

If required to decide the jurisdictional question, however, I would conclude that the Tenth Circuit lacked jurisdiction over Monsalvo's petition. "[T]he party invoking federal jurisdiction bears the burden of establishing its existence," and, on the admittedly limited briefing before us, Monsalvo has not met his burden. *Steel Co.*, 523 U. S., at 104. In contending otherwise, Monsalvo and the majority offer two

8                 MONSALVO VELÁZQUEZ *v.* BONDI

THOMAS, J., dissenting

distinct theories of jurisdiction, but neither holds up.

A

The difficulty for Monsalvo stems from his litigation strategy below. He asked the Tenth Circuit to review only the BIA's denial of his reconsideration motion. *Supra*, at 5. That motion, in turn, challenged only one of the BIA's two bases for denying his reopening motion. *Supra*, at 4–5. Monsalvo objected to the BIA's conclusion that the motion was untimely, but not its conclusion that it also failed on the merits. *Ibid.* In other words, the Government is right to say that, before the Tenth Circuit, he sought only "to alter a nondispositive portion of the Board's reasoning" for denying reopening. Brief for Respondent 19.

That framing fits poorly with §1252, which ties jurisdiction to a narrow version of the term "final order of removal." Before IIRIRA, the predecessor term "final order of deportation" covered "'all determinations made during and incident to the administrative proceeding' on removability." *Nasrallah*, 590 U. S., at 584 (quoting *Foti* v. *INS*, 375 U. S. 217, 229 (1963)). But, under IIRIRA, a "final order of removal" is only the "final order 'concluding that the alien is deportable or ordering deportation.'" 590 U. S., at 579 (quoting §1101(a)(47)(A)).

*Nasrallah* made clear that a "final order of removal" refers only to the portion of an IJ or BIA decision that finds or orders removability, not the entirety of that decision. In that case, we considered whether an alien barred under §1252(a)(2)(C) from raising a factual challenge to his final order of removal could still factually challenge the denial of CAT relief. *Id.*, at 576.

We began by considering the nature of the CAT denial. In the underlying BIA decision, that denial immediately preceded the alien's removal order:

    "FURTHER ORDER: The Immigration Judge's order

granting the respondent's application for deferral of removal under the Convention Against Torture is vacated.

"FURTHER ORDER: The respondent is ordered removed from the United States to Lebanon pursuant to the Immigration Judge's August 11, 2016, order." App. to Pet. for Cert. in *Nasrallah* v. *Barr*, O. T. 2019, No. 18–1432, p. 21a.

Still, every Member of this Court recognized that the CAT denial was a distinct order, and not part of the removal order. 590 U. S., at 582; *id.*, at 591 (Thomas, J., dissenting).

The *Nasrallah* majority then concluded that the distinct status of a CAT order preserved Nasrallah's factual challenge to that order. On its understanding, §1252(a)(2)(C) constrained only Nasrallah's ability to challenge his final order of removal itself, plus any "rulings that affect[ed] the validity of the final order of removal" and so "merge[d] into the final order of removal for purposes of judicial review." *Id.*, at 582. Because the CAT order fell into neither category, and instead had a separate jurisdictional basis, Nasrallah could still pursue his factual challenge to the CAT order "together with the final order of removal." *Id.*, at 582–583.[2]

Although this conclusion aided Nasrallah, it cuts against Monsalvo. Unlike a CAT claimant, Monsalvo cannot point

_____

[2] I adhere to my disagreement with *Nasrallah*'s disposition. See 590 U. S., at 589–591 (dissenting opinion). On my view, the §1252(a)(2)(C) bar applies to all claims governed by §1252(b)(9)'s "zipper clause." *Ibid.* That clause "consolidates 'all questions of law and fact . . . *arising* from any action taken or proceeding brought to remove an alien'" into review of the final order of removal, where they are equally subject to §1252's "limitations on final orders of removal." *Id.*, at 591–592. "'Arising from'" is a sweeping term, and a CAT order issued during a removal proceeding falls within its ambit. *Id.*, at 591. Regardless, because this case turns on jurisdictional categories to which the *Nasrallah* majority agreed that the zipper clause applies, my disagreement is of no moment here. See *ibid.*

THOMAS, J., dissenting

to any basis for jurisdiction other than §1252(a)(1). To establish jurisdiction, he must show that his petition before the Tenth Circuit challenged either the final order of removal itself, as *Nasrallah* construed it, or at least the validity of that order. *Supra*, at 3–4. But, in seeking review only of a "nondispositive portion of the Board's reasoning," Monsalvo's petition did neither. Brief for Respondent 19.

Monsalvo all but conceded below that his petition did not bear on his final order of removal. As he explained in his Tenth Circuit briefing, he "was *not* seeking to 'vacate the order of removal against him.'" *Ibid.* (quoting Reply Brief for Petitioner in No. 22–9576 (CA10), pp. 5–6 (sealed)). He explained that a ruling that the BIA was wrong about the date of his voluntary-departure deadline "'would have no effect whatever'" on "'the underlying order of removal.'" Brief for Respondent 19 (quoting Reply Brief for Petitioner in No. 22–9576 (CA10), at 5; emphasis deleted). Monsalvo sought only a collateral advantage: If his voluntary-departure deadline did not expire until December 13, then his motion to reopen—filed the same day—would have canceled his grant of voluntary departure without making him subject to the penalties associated with failing to timely depart, such as "ineligibility for future immigration relief." 88 F. 4th, at 1307.

It thus is not apparent how the Tenth Circuit had jurisdiction to hear Monsalvo's case. Section 1252 allows review of a limited range of removal-related matters; it is not a vehicle to head off unwanted postremoval consequences.

B

Monsalvo's attempt to reconceptualize his challenge is unpersuasive. He argues before this Court that the penalties for failing to timely depart are not collateral consequences, but terms of his final order of removal. Reply Brief 4. If we recognized that his motion to reopen was filed *before* his voluntary-departure deadline, he says, then those

THOMAS, J., dissenting

terms would disappear, and the order would transform into one "*without* any severe penalties." *Ibid.*

Monsalvo divines this conclusion from the BIA's original decision on his removability, in which the BIA affirmed the IJ's denial of CAT and withholding relief. Monsalvo reads that decision to state that, if he failed to timely depart, a final order of removal with "three distinct terms" would go into effect: first, that he "'shall be removed'"; second, that he "'shall be subject to a [monetary] penalty'"; and third, that he "'shall be ineligible for a period of 10 years for any further relief under [certain INA provisions].'" *Id.*, at 5 (quoting App. to Pet. for Cert. 42a–43a). "If the Tenth Circuit had granted the petition for review," he says, "the result would have been to delete Clauses 2 and 3" from this removal order. Reply Brief 5.

This argument conflicts with *Nasrallah*. Again, that decision made clear that a final order of removal refers only to the portion of the IJ's or BIA's decision "'concluding that the alien is deportable or ordering deportation.'" 590 U. S., at 579 (quoting §1101(a)(47)(A)). Other directives do not qualify, even if they are imposed concurrently. Thus, just as we recognized that the CAT order in *Nasrallah* was not a final order of removal, *id.*, at 582, an order levying penalties upon Monsalvo for failure to timely depart is also distinct. In attempting to collapse the latter order into his final order of removal, Monsalvo wrongly attempts to revive the pre-IIRIRA approach. *Supra*, at 8.

Moreover, Monsalvo misunderstands the function of the BIA's penalty language. That language did not purport to impose liability on him in the event of his failure to timely depart. Rather, it carried out the BIA's statutory obligation to give him "notice" of the penalties listed in the INA for untimeliness:

> "NOTICE: If a respondent fails to voluntarily depart the United States within the time period specified, or

any extensions granted by the DHS, the respondent *shall be subject to a civil penalty* as provided by the regulations and the statute, and *shall be ineligible for a period of 10 years for any further relief under* [certain INA provisions]. *See* section 240B(d) of the [INA]." App. to Pet. for Cert. 42a–43a (emphasis added).

See also §1229c(d)(3).

In other words, even if the "notice" paragraph could be considered part of his final order of removal, the statements therein are not "terms" of an order that restrict Monsalvo. Rather, those statements merely notify Monsalvo of the law. They retain the same force and effect whether or not Monsalvo met his voluntary-departure deadline. The underlying source of Monsalvo's current exposure to liability is instead the INA. §1229c(d) (codifying INA §240(B)(d), 110 Stat. 3009–597). So, the "notice" paragraph is not the true target of Monsalvo's petition, and it cannot supply jurisdiction.

The same is true of the IJ order that the BIA incorporated by reference. That order is the alternate order of removal that the IJ entered when granting voluntary departure. See *supra*, at 4. It simply stated that "respondent shall be removed to Mexico on the charge in his Notice to Appear." App. to Pet. for Cert. 51a. And, although the IJ's decision also warned of the statutory consequences associated with untimeliness, this warning too was just an acknowledgment of the "penalties . . . under Section 240B(d)." *Id.*, at 51a–52a. So, that removal order is no more helpful for Monsalvo.

In short, Monsalvo's theory rests on a misunderstanding of both the scope of a final order of removal and the meaning of the supposed "terms" of this order. Because he bears the

jurisdictional burden, these shortcomings should be dispositive. *Steel Co.*, 523 U. S., at 104.[3]

### C

For its part, the majority declines to defend Monsalvo's jurisdictional theory. Arguments for jurisdiction are not exempt from principles of party presentation and forfeiture, so that choice should be the end of the jurisdictional road. See, *e.g.*, *TransUnion LLC* v. *Ramirez*, 594 U. S. 413, 434–435, n. 6 (2021).

Instead, the majority develops its own theory for jurisdiction, based on reasoning that appeared nowhere in the briefing or at oral argument. The majority agrees with Monsalvo that he seeks review of a "term" in his final order of removal, but it identifies the relevant term as the BIA's provision of a 60-day voluntary-departure period. *Ante*, at 7. And, the majority concludes, the Tenth Circuit had authority to interpret the meaning of "60 days" in this "term" under its jurisdiction to review "'final order[s] of removal'" and "'questions of law . . . arising from' them." *Ante*, at 9–10 (quoting §§1252(a)(1), (b)(9)). The majority errs with

---

[3]To the extent Monsalvo suggests that courts of appeals have jurisdiction to review reconsideration decisions as a categorical matter, he misreads both 8 U. S. C. §1252 and *Reyes Mata* v. *Lynch*, 576 U. S. 143 (2015). Section 1252(b)(9) does not authorize review of "'all questions of law and fact . . . arising from' the removal proceedings." Reply Brief 3. Rather, it specifies that, absent an independent jurisdictional basis, such questions of law and fact are reviewable only if brought "in judicial review of a final order under this section." §1252(b)(9). That language thus facilitates reviewability only if a petitioner has in fact sought review of a final order of removal.

*Reyes Mata* did not suggest otherwise in noting that courts have long reviewed reconsideration decisions, and that §1252(b)(6) "contemplates" review of such decisions, in the course of reviewing final orders of removal. 576 U. S., at 147–148. Those points do not conflict with the rule that a petitioner generally must challenge a final order of removal before he can raise other issues alongside that challenge. See §1252(b)(6) (permitting consolidation of a challenge to a "motion to . . . reconsider the order" "[w]hen a petitioner seeks review of an order under this section").

THOMAS, J., dissenting

both premises.

1

Like Monsalvo, the majority errs by assuming that Monsalvo's challenge goes to his final order of removal. To conclude that the grant of voluntary departure is part of Monsalvo's final order of removal, the majority appears to view the order as comprising the BIA's entire decision. See *ante*, at 7. But, such a broad construction conflicts with *Nasrallah*'s recognition that the CAT order was distinct, even when situated alongside a final order of removal in the same decision. See *supra*, at 8–10. Following *Nasrallah*, a grant of voluntary departure is a separate order that "is not itself a final order of removal." 590 U. S., at 582. The BIA's regulations reflect that point: They speak separately of an "order granting voluntary departure" and an "order of removal." 8 CFR §1240.26(c)(3). The scope of Monsalvo's voluntary-departure period is therefore a question about the voluntary-departure order, *not* the final order of removal.

The majority ignores *Nasrallah*'s narrow interpretation of a "final order of removal." Brushing past the logic of that decision, the majority summarily asserts that *Nasrallah* is consistent with its view that a final order of removal encompasses the entire accompanying BIA decision. *Ante*, at 10. But, *Nasrallah*'s holding (that a CAT order is "'not part of the removal order'") cannot be divorced from its reasoning (how to identify the removal order). Contra, *ante*, at 10.

In discarding *Nasrallah*, the majority instead relies on the parties' supposed agreement that the entire BIA decision constitutes a "final order of removal." It asserts that the parties have agreed that, "[o]n October 12, 2021, the Board issued an order which . . . constituted a final order of removal." *Ante*, at 7. But, "federal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction," so we can accept the assumption that we are reviewing a final order of removal only if it is in

THOMAS, J., dissenting

fact true. *Henderson* v. *Shinseki*, 562 U. S. 428, 434 (2011).

Regardless, the majority's claim of agreement between the parties rests on a misreading of *both* parties' arguments. Although the Government agrees that the BIA decision *contains* a final order of removal, see Tr. of Oral Arg. 38, it rejects Monsalvo's position that this order and the BIA decision are one and the same. As the Government explains, it had previously taken the broader view based on pre-IIRIRA case law, but this Court "rejected [it] in *Nasrallah*." *Id.*, at 35, 60. For his part, Monsalvo does purport to "challeng[e] the terms of his removal order," Reply Brief 5, but the majority misunderstands *which terms* Monsalvo puts in issue. It asserts that he seeks clarification of what his "order meant" with respect to his obligation "to leave voluntarily 'within 60 days.'" *Ante*, at 7. But, as explained, Monsalvo actually views the relevant terms as the statutory penalties invoked by the BIA. *Supra*, at 10–11.[4] The majority's framing of the "final order of removal" in this case rests on a stipulation that no party makes.

### 2

Even if Monsalvo's voluntary-departure order could be considered part of his final order of removal, it does not follow that the Tenth Circuit would have had jurisdiction over a request to clarify the meaning of "60 days." As relevant here, §1252 confers jurisdiction only for "[j]udicial review of a final order of removal." §1252(a)(1). The majority assumes that a request for clarification would qualify, but that assumption is debatable at best. *Ante*, at 7–8.

Until now, we have understood §1252 to "ves[t] the courts

_____

[4] As best I can tell, Monsalvo does not even view the "60 days" language as a term in his final order of removal. He states that the order contains only "three distinct terms"—the directive that he "'shall be removed,'" and the two clauses regarding penalties for failure to timely depart. Reply Brief 5 (quoting App. to Pet. for Cert. 42a–43a); see *supra*, at 11.

Thomas, J., dissenting

of appeals with the authority to consider petitions challenging 'final orders' commanding the 'removal' of aliens from the United States." *Calcano-Martinez* v. *INS*, 533 U. S. 348, 350 (2001). A request for clarification about an order's meaning, standing alone, is not a *challenge* to that order. It does not ask the court to "disturb the final order of removal" in any way. *Nasrallah*, 590 U. S., at 582. Rather, it amounts to a request for a declaratory judgment, if not an advisory opinion.

Extending §1252 to reach such a request is hard to square with our conception of judicial review more generally. "The question before an appellate Court is, was the *judgment* correct." *McClung* v. *Silliman*, 6 Wheat. 598, 603 (1821). After all, "our power is to correct wrong judgments, not to revise opinions." *Herb* v. *Pitcairn*, 324 U. S. 117, 126 (1945).

Given that we have not previously confronted this issue, and the parties have not briefed it, I express no definitive view. But, it seems at minimum questionable whether an alien who does not oppose the disposition of his final order of removal seeks "review" of that order under §1252.

The majority skips over this issue by resorting to §1252(b)(9), which it reads to allow a court of appeals to address any "'questions of law . . . arising from'" a term in a final order of removal. *Ante*, at 9. But, §1252(b)(9) is a "jurisdictional limitation," not a grant of jurisdiction. *AADC*, 525 U. S., at 482–483. It specifies that judicial review of all questions of law arising from removal proceedings "shall be available only in judicial review of a final order under this section." §1252(b)(9). That provision thus does not say that an alien can raise any question of law. Rather, absent an independent jurisdictional basis, "a federal court has jurisdiction to review" such a question only "when the court reviews a 'final order' of removal." *Johnson* v. *Arteaga-Martinez*, 596 U. S. 573, 584 (2022) (Thomas, J., concurring). Section 1252(b)(9) accordingly does not resolve what it means for a court to "review" a final order of removal.

Thomas, J., dissenting

## IV

Finally, policy considerations cannot change our analysis. The majority highlights that ruling against Monsalvo on jurisdictional grounds would lead to a curious result. We would invite pointless litigation, the majority asserts, if we held that §1252 requires "an individual [to] include in his petition some challenge to his 'removability' from this country." *Ante*, at 8. But, even if true, this consequence is beside the point.

"[W]e must enforce the statute that Congress enacted." *Obduskey* v. *McCarthy & Holthus LLP*, 586 U. S. 466, 481 (2019). That means giving effect to Congress's decision in §1252 to "substantially limi[t] the availability of judicial review," *Nken* v. *Holder*, 556 U. S. 418, 424 (2009), specifically by permitting review of "all questions of law . . . arising from any action taken or proceeding brought to remove an alien" only in the course of reviewing a "final order of removal." §§1252(a)(1), (b)(9). And, it means giving effect to *Nasrallah*'s narrow reading of the term "final order of removal."

In many cases, a petitioner will still be able to obtain judicial review even under §1252's "more restrictive" scheme. *AADC*, 525 U. S., at 475. In *Nasrallah*, for example, the Court understood its reading of "final order of removal" to benefit Nasrallah. 590 U. S., at 582–583. But, the logic of that decision applies just the same when its effect is to preclude judicial review.

All this is not to say that §1252 denies Monsalvo his day in court. Perhaps, as the Government suggests, things would have been different if he had also challenged the BIA's reopening decision. Brief for Respondent 20. Or, perhaps he could still pursue relief in non-removal-related litigation, such as by filing suit under the Administrative Procedure Act "after unsuccessfully seeking [the Government] to return his voluntary departure bond or to adjust status in the country." Tr. of Oral Arg. 32. But, we cannot "rewrite

18          MONSALVO VELÁZQUEZ *v.* BONDI

Thomas, J., dissenting

the laws passed by Congress and signed by the President"
to shield Monsalvo from the consequences of his choice to
challenge only the BIA's reconsideration decision. *Nasral-
lah*, 590 U. S., at 583.

\*          \*          \*

Because "a congressional grant of jurisdiction is a *prereq-
uisite* to the exercise of judicial power" in this case, this
Court must carefully abide by Congress's jurisdictional
strictures. *Patchak*, 583 U. S., at 254 (plurality opinion).
We thus should have vacated and remanded for the Tenth
Circuit's consideration of the jurisdictional issue. Disre-
garding Monsalvo's jurisdictional burden, the majority in-
stead finds jurisdiction based on an unpersuasive theory of
its own creation. I respectfully dissent.

Cite as: 604 U. S. ____ (2025)          1

ALITO, J., dissenting

# SUPREME COURT OF THE UNITED STATES

————

No. 23–929

————

## HUGO ABISAÍ MONSALVO VELÁZQUEZ, PETITIONER *v.* PAMELA BONDI, ATTORNEY GENERAL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE TENTH CIRCUIT

[April 22, 2025]

JUSTICE ALITO, with whom JUSTICE KAVANAUGH joins,
dissenting.

I agree with JUSTICE THOMAS that the Court should re-
mand this case for the Court of Appeals to decide in the first
instance whether it possessed jurisdiction to entertain peti-
tioner's petition for review. That case-specific argument
was not raised below, and we did not grant review to decide
it. If forced to decide the jurisdictional question, however,
I would agree with JUSTICE THOMAS and JUSTICE BARRETT
that the Court of Appeals lacked jurisdiction. But because
the Court has rejected those jurisdictional arguments, I
write separately to explain why, in my view, the Court's
analysis of the merits is wrong.

The merits question in this case—whether petitioner left
the United States within "60 days" after October 12, 2021—
is straightforward. The 60th "day" after October 12, 2021,
was Saturday, December 11, 2021. And petitioner failed to
depart the country by that Saturday. Saturday is a day of
the week, and there is no reason why petitioner could not
have left the country on or before that date. Petitioner gives
us no reason to believe—and I am aware of none—that the
roads to Mexico, his home country, were closed; so he could
have driven or taken a bus across the border. He also could
have flown to Mexico or any other country that would admit
him. Nevertheless, the Court holds that he was entitled to

a 2-day extension because the last day of his voluntary de-
parture deadline happened to fall on a weekend.  There is
no justification for that decision.

The Court is sympathetic to petitioner's plight, but the
relevant statutory provision, 8 U. S. C. §1229c(b)(2), sets a
deadline, and no matter how such a deadline is calculated,
there will always be those who happen to miss it by a day
or so.  And that will be true whether the deadline is always
60 days or is sometimes extended to 61, 62, or 63 days.
There will always be a sympathetic *pro se* alien[1] who is a
day or two late.  Unless the Court is willing to extend the
statutory deadline indefinitely, it would presumably be
forced to say in such cases that a day too late is just too bad.
For this reason, sympathy for petitioner cannot justify the
Court's decision.

That is especially true because today's decision will affect
cases other than petitioner's.  We have not been told how
many aliens who are granted voluntary departure are or-
dered to leave within a specified number of days after the
date of the relevant order, but assuming that roughly the
same number of such orders are issued on each day from
Monday through Friday, it is probable that nearly half of
the departure deadlines in such cases will fall on a Satur-
day, Sunday, or federal holiday.  As a result, these individ-
uals will be given a windfall that is not enjoyed by most
other similarly situated aliens.  As I shall explain, there is
no good reason for that disparate treatment.

## I

"Voluntary departure" is part of a bargain that benefits
both the Government and an alien who is subject to re-

---

[1] The Immigration and Nationality Act uses the term "alien," which is
defined as "any person not a citizen or national of the United States."  66
Stat. 166, 8 U. S. C. §1101(a)(3).  Thus, in the language of the Act, "alien"
and "noncitizen" are not synonymous.

ALITO, J., dissenting

moval. When such an alien voluntarily leaves, the Government is spared "the expense of deportation," and the alien "avoids extended detention," "can select the country of destination," and—what is perhaps most important—avoids the restriction on readmission that results from deportation. *Dada* v. *Mukasey*, 554 U. S. 1, 11 (2008). Federal immigration law has permitted this mutually beneficial bargain for nearly a century. See Alien Registration Act of 1940, 54 Stat. 672.

That bargain is effective only if the alien lives up to his promise to depart, and in the past that promise was not always kept. For some time, voluntary departure agreements did not include a specific deadline, and some aliens who had agreed to leave "'continue[d] their illegal presence in the United States for months, and even years.'" *Dada*, 554 U. S., at 9 (quoting Letter from B. Habberton, Acting Commissioner on Immigration and Naturalization). In 1996, Congress tried to fix that problem by enacting the statutory deadline at issue here. It provides that—in typical circumstances—"[p]ermission to depart voluntarily . . . shall not be valid for a period exceeding 60 days." 8 U. S. C. §1229c(b)(2). In compliance with this provision, the Board of Immigration Appeals (BIA) issued an order giving petitioner "60 days to voluntarily depart . . . , the maximum period allowed by [§1229c(b)(2)]." App. to Pet. for Cert. 40a.

We generally presume that terms used in statutes carry the same meaning they have in ordinary usage. See *Niz-Chavez* v. *Garland*, 593 U. S. 155, 160 (2021) ("When called on to resolve a dispute over a statute's meaning, this Court normally seeks to afford the law's terms their ordinary meaning at the time Congress adopted them"). Therefore, when interpreting the term "days" in §1229c(b)(2), we should start with the presumption that it means what it means in ordinary usage: "a division of time equal to 24 hours and representing the average length of the period during which the earth makes one rotation on its axis."

Random House Webster's Unabridged Dictionary 510 (2d ed. 2001). Saturdays, Sundays, and holidays fit this definition, so they presumptively qualify as "days" within the meaning of the statute. Is there any reason to find that this presumption is overcome?

The Court's answer is "yes" because, in its view, the term "days," as used in the voluntary departure provision, has the special meaning that often applies in provisions that set deadlines for filing papers in a court or government office. See, *e.g.*, Fed. Rule Civ. Proc. 6(a)(1)(C); Fed. Rule App. Proc. 26(a)(1)(C). But the justification for this special rule—the fact that filing papers in a court or government office on a weekend or holiday is often difficult or impossible—has no application where the task that must be accomplished may be done just as easily on any day of the week. And that is certainly the case here. Petitioner has not provided any reason why he could not have departed on Saturday December 11 or Sunday December 12. He has not claimed, for example, that his religion prohibited him from traveling on either or both of those days. And on those days, he could have left the United States by car, bus, or plane. So why should anyone think that he was entitled to an extension giving him, not the 60 days prescribed by statute, but an extra two days? In the absence of some strong contrary indication, "affected individuals and courts alike are entitled to assume statutory terms bear their ordinary meaning." *Niz-Chavez,* 593 U. S., at 163. "[U]ntil and unless someone points to evidence" that a statute bears an alternative, "specialized" meaning, we assume that the ordinary meaning controls. *Ibid.* And there is nothing here that can overcome that usual assumption.

## II

### A

The Court rejects the ordinary meaning of the statutory

ALITO, J., dissenting

language because, in its view, 8 U. S. C. §1229c(b)(2) incorporated a "'longstanding administrative construction'" of the term "days," according to which a deadline in the immigration laws is taken to extend if the final day lands on a weekend or holiday. *Ante*, at 12. But this argument fails because the regulatory definition on which it rests applies by its terms only to deadlines that appear in the immigration *regulations*. When Congress enacted the voluntary departure deadline in 1996, the pertinent regulation stated that "[t]he term *day* when computing the period of time for taking any action *provided in this chapter*"—that is, in the relevant chapter of the regulations—"shall include Saturdays, Sundays, and legal holidays, except that when the last day of the period so computed falls on a Saturday, Sunday, or a legal holiday, the period shall run until the end of the next day which is not a Saturday, Sunday, nor a legal holiday." 8 CFR §1.1(h) (1996) (emphasis added).[2] So even if Congress had enacted this provision into law, it would not have affected the meaning of §1229c(b)(2).

In an effort to draw some support from this regulation, the Court disregards its specific terms and contends that it embodied a broader rule for counting days that applies even when the action that must be taken by the deadline can be done just as easily on weekends and holidays as on ordinary business days. It is doubtful, however, that the Court is ready to embrace all the implications of this argument. The term "days" appears numerous times in the immigration laws. Does the Court think that every one of these provisions incorporates its unorthodox counting rule? Consider, for example, 8 U. S. C. §1282(a), which provides that in most instances an "alien crewman" may not be permitted to "land temporarily in the United States" for more than 29 days. Suppose that the 29th day is a Saturday. Does that

--------

[2] A substantially identical definition now appears in 8 CFR §§1.2 and 1001.1(h) (2024).

mean that the alien crewman may stay an additional two days? There are many other similar provisions. See, *e.g.*, §1187(a)(1) (permitting the waiver of the usual visa requirements for a tourist seeking entry for up to 90 days); §1184(d) (requiring certain visa applicants to establish that they are "actually willing to conclude a valid marriage" to an identified citizen within 90 days of arrival); §1101(a)(13)(C)(ii) (providing that an already admitted alien is regarded as seeking admission if he has been absent from the United States for "a continuous period in excess of 180 days"); §1101(f)(7) (providing that an alien is not of "good moral character" if he has been imprisoned, in a relevant timeframe, for an aggregate period of 180 days or more).

If, as I assume, the Court does not mean to hold that its unorthodox interpretation of the term "days" applies to every immigration provision that contains that term, then the most that might be said about the counting rule on which it relies is that it is presumptively incorporated when its underlying rationale—the impossibility or difficulty of compliance on a weekend or holiday—is applicable. And if that is so, that construction does not apply to the voluntary departure deadline.

I would view this case differently if it involved an administrative interpretation of a statute that contains a technical term or a term that has a special meaning in a particular industry. In *United States* v. *Hill*, 506 U. S. 546 (1993), for example, we noted "well established" treasury regulations that reflected an "accepted distinction" between the terms "mineral deposit" and "mineral enterprise," at least for the purpose of taxing certain mineral interests. *Id.,* at 553–554. And we assumed that Congress "relied" on that "accepted distinction" when it used the term "mineral deposit" in a tax provision. *Id*., at 553. See also *Corning Glass Works* v. *Brennan*, 417 U. S. 188, 201 (1974) ("[W]here Congress has used technical words or terms of art, 'it [is] proper

ALITO, J., dissenting

to explain them by reference to the art or science to which they [are] appropriate'"). Here, however, the critical term is a commonplace word used countless times in everyday speech.

In sum, Congress had no reason to expect that the purely regulatory definition of "day" was a "longstanding administrative construction" that would in any way bear on the meaning of "day" in the voluntary departure provision.

B

Without support for its interpretation in ordinary language or any special definition that is applicable in a situation like the one at hand, the Court moves on to the presumption of consistent usage, *i.e.*, the presumption that a term has the same meaning throughout a statute. See *Powerex Corp.* v. *Reliant Energy Services, Inc.*, 551 U. S. 224, 232 (2007) ("[I]dentical words and phrases within the same statute should *normally* be given the same meaning" (emphasis added)). Invoking this presumption, the Court reasons as follows: The term "days" appears not only in the provision fixing the deadline for voluntary departure, but also in neighboring provisions that set certain filing deadlines. *Ante*, at 13 (citing 8 U. S. C. §1229a(c)(6)(B) (motion for reconsideration of removal order "must be filed within 30 days of the date of entry of a final administrative order of removal"); §1229a(c)(7)(C)(i) (motion to reopen removal proceedings "shall be filed within 90 days of the date of entry of a final administrative order of removal")). As the Court notes, the Government concedes that those filing deadlines extend to the next business day when the final day lands on a weekend or holiday. *Ante,* at 13 (citing Brief for Respondent 43–44). And the Court therefore concludes that the same rule should apply to the voluntary departure deadline.

By citing the Government's concession about the filing deadline provisions, the Court attempts to cloud the real

question, which is whether *this Court* should interpret the term "days" in the filing provisions and the departure provision as having the same meaning or two different meanings. After all, the mere fact that the Government believes that the section's filing deadlines should extend when they land on a weekend or holiday does not bind us. Cf. *Loper Bright Enterprises* v. *Raimondo*, 603 U. S. 369, 386–390, 412–413 (2024). And the Court's willingness to accept the Government's interpretation of the relevant provisions is notably selective. The Court eagerly adopts the Government's interpretation of the filing provisions but rejects the Government's position regarding the voluntary departure provision.

So, I repeat, the real question is what *this Court* should hold regarding the meaning of the term "days" in the provisions in question. We have three choices. First, we could hold that "days" has its ordinary meaning in both the voluntary departure and the filing provisions. Second, we could hold that the term has a specialized meaning—that it incorporates the rule that a deadline should extend when the final day lands on a weekend or holiday—in all the provisions. Or third, we could hold that the term "days" in the voluntary departure provision has the term's ordinary meaning but that the same term, as used in the filing provisions, has the specialized meaning that often applies in provisions of that kind.

The presumption of consistent usage cannot justify the choice of the second option rather than the first, and the Court does not explain why its preferred option (number two) is better than option three, which heeds the ordinary meaning of the term "days" except where there is a reason to adopt a specialized meaning. We *presume* that a term has the same meaning in all provisions of a law, but the presumption can be overcome, and there is a strong argument that it should be overcome here due to the unique rule that has long been applied to many filing deadlines.

## C

Notably, when faced with the possibility that its counting rule might apply to *every* provision of the immigration laws that includes the term "day," the Court retreats from the presumption of consistent usage. It asserts that "different statutes passed at different times against different regulatory backdrops may bear different meanings." *Ante,* at 18, n. 5. The Court agrees, then, that we must look at the specific circumstances under which the filing and the voluntary departure deadlines were enacted to determine whether the term "day" should be given the same meaning in each provision.

In this case, those circumstances support the inference that Congress intended for the filing deadlines, but not the voluntary departure deadline, to extend when the final day lands on a weekend or holiday. As the Court notes, since at least the 1950s, the immigration regulations have provided that deadlines *in the regulations* are extended when the final day falls on a weekend or holiday. See *ante*, at 12–13 (citing 8 CFR §1.1(a)(6) (1958)). When Congress enacted the statutory filing deadlines, it parroted filing deadlines that already appeared in those regulations, and it did so at the "recommendatio[n]" of the Executive Branch. *Dada*, 554 U. S., at 13–14. It is therefore quite possible that Congress had the regulatory definition of "day" in mind when it enacted the statutory filing deadlines. The same, however, cannot be said for the voluntary departure deadline because it had no regulatory precursor.

The Court dismisses this important distinction by asserting that "[e]xactly nothing in §304 hints that deadlines found there should operate differently." *Ante,* at 16. But of course, exactly nothing in §304 says that "day" should be given a specialized technical meaning either. The Court's departure from ordinary meaning is premised on its view that Congress adopted a "'longstanding administrative con-

10      MONSALVO VELÁZQUEZ *v.* BONDI

ALITO, J., dissenting

struction.'" *Ante,* at 12. If the Court is going to look to regulatory history to determine the meaning of the statute's terms, it cannot simply close its eyes when that regulatory history suggests that the voluntary departure deadline should be treated differently.[3]

D

The Court's final argument is that the filing and voluntary departure deadlines are "intertwined" and that a uniform interpretation is therefore "sensible." *Ante,* at 17. Petitioner, for example, was subject to both a deadline to voluntarily depart and a separate deadline to move to reopen his removal proceedings. In reality, however, petitioner only faces penalties for violating one of those deadlines: the 60-day voluntary departure deadline. No one argues here that petitioner was also at risk of missing his deadline to file a motion to reopen. After the BIA issued its order of October 12, petitioner had 90 days to move to reopen the removal proceeding, see 8 U. S. C. §1229a(c)(7)(C)(i), which meant he had until January 10, 2022. He filed his motion well before that date, so the filing deadline was not implicated in his case. But because he had sought and had been granted the opportunity to leave the country voluntarily, he was required either to comply with the departure deadline or move to reopen before that deadline. See §1229c(d)(1)(B). By failing to timely depart, petitioner became ineligible for relief from removal, and his motion to reopen was destined to fail on the merits. *Ibid.*

───────────

[3] The Court contends that the Government implicitly accepted its understanding of the term "days" when it promulgated a regulation reflecting the voluntary departure deadline, see *ante,* at 14, but that is simply not true. The regulation incorporating the voluntary departure deadline provides that "[i]n no event can the total period of time [to voluntarily depart], including any extension, exceed . . . 60 days *as set forth in Section 240B of the Act.*" 8 CFR §1240.26(f) (emphasis added). Thus, the regulation pointedly notes that the voluntary departure deadline is governed by the statute, not any regulation.

Cite as: 604 U. S. ____ (2025)          11

ALITO, J., dissenting

\*     \*     \*

The provision before us is straightforward. It provides that "[p]ermission to depart voluntarily . . . shall not be valid for a period exceeding 60 days." §1229c(b)(2). Because I see no reason to apply a "specialized" definition of "day," I would take that language for what it's worth. "60 days" means "60 days."

I must therefore respectfully dissent.

Cite as: 604 U. S. ____ (2025) 1

BARRETT, J., dissenting

# SUPREME COURT OF THE UNITED STATES

_____

No. 23–929

_____

## HUGO ABISAÍ MONSALVO VELÁZQUEZ, PETITIONER *v.* PAMELA BONDI, ATTORNEY GENERAL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE TENTH CIRCUIT

[April 22, 2025]

JUSTICE BARRETT, with whom JUSTICE KAVANAUGH
joins, dissenting.

I agree with JUSTICE THOMAS that the Court is wrong
about jurisdiction, but my reasoning is different from his.
JUSTICE THOMAS would hold that "a 'final order of removal'
refers only to the portion of an [Immigration Judge] or
[Board of Immigration Appeals] decision that finds or or-
ders removability, not the entirety of that decision." *Ante*,
at 8 (dissenting opinion). Meanwhile, the Court seems to
believe that the entirety of an IJ or BIA decision finding
removability is the "final order of removal." *Ante*, at 9–10
(opinion of the Court). In short, JUSTICE THOMAS and the
Court disagree about how much of the document issued by
an IJ or the BIA is open to challenge: The whole thing? Or
just the underlying conclusion that the noncitizen is remov-
able?

I would leave that dispute for another day. In my view,
there is no need to debate the scope of the removal order,
because no matter how broadly you construe it, Monsalvo
does not dispute a single word in it.

The Tenth Circuit had jurisdiction if and only if
Monsalvo's petition for review sought "[j]udicial review of a
final order of removal" under 8 U. S. C. §1252(a). An "'or-
der of removal'" is an "order 'concluding that the alien is
deportable or ordering deportation.'" *Nasrallah* v. *Barr*,

590 U. S. 573, 579 (2020) (quoting §1101(a)(47)(A)). Generally, an order is entered by an IJ and becomes "final" if it is affirmed by the BIA. §1101(a)(47)(B)(i). This Court has held that noncitizens may challenge (1) final orders of removal themselves; (2) certain orders brought alongside final orders of removal; and (3) rulings that affect the validity of final orders of removal. See *id.*, at 580–583. These three categories have something in common: Each requires the noncitizen to contest some element of the final order of removal.

Yet Monsalvo did not dispute *anything* in the IJ and BIA decisions finding him removable. He asked the Tenth Circuit to review only the BIA's denial of his motion to reconsider its denial of his motion to reopen his removal proceedings. (As these procedural twists and turns suggest, this case comes to us in an idiosyncratic posture.) In his motion to reconsider, Monsalvo had asked the BIA to revisit only its opinion that he had filed his motion to reopen before the expiration of the voluntary departure period—a view that the BIA had expressed in its denial of Monsalvo's motion to reopen. The decisions finding him removable, however, did not address how to count days under §1229c(b)(2), much less whether Monsalvo had overstayed his voluntary removal period. So any way you slice it, Monsalvo's petition for review did not seek "[j]udicial review of a final order of removal" under §1252(a)(1). Proof? Even after Monsalvo's victory in this Court today, every word in the IJ and BIA decisions finding him removable remains legally valid.

I am unpersuaded by the Court's rationale for jurisdiction. The Court attempts to reframe what is really a request for clarification about the meaning of §1229c(b)(2) as a "challenge" to a notice provision in the original voluntary departure order. *Ante*, at 6–10. But—even assuming that the now-inoperative voluntary departure order has any relevance at this stage—a request for clarification about the order's meaning simply does not speak to the validity of the

order itself. See *ante*, at 15–16 (THOMAS, J., dissenting).

The Court's only response is that my reading of §1252(a)(1) is inconsistent with §1252(b)(9), also known as the "zipper clause." *Ante*, at 10–11. This argument is puzzling. Section 1252(b)(9) provides that certain forms of judicial review "shall be available only in judicial review of a final order under this section." It therefore underscores that judicial review is available under §1252(a)(1) only if there is a challenge to a "final order of removal." And here, for the reasons that I have explained, there is no such challenge.

In short, the Court has no answer to the most important question: How can Monsalvo seek judicial review of his final order of removal while conceding that his final order of removal was lawful? He cannot, so the Tenth Circuit lacked jurisdiction.*

*    *    *

The exact scope of a "final order of removal" has consequences for a host of fact patterns besides the unusual one before us, and because Monsalvo has not challenged any portion of the IJ and BIA decisions finding him removable, I would leave the issue alone. Still, I share JUSTICE THOMAS's bottom line: The Court should not have addressed the jurisdictional question at all, and, having forged ahead anyway, it got the answer wrong. I respectfully dissent.

———————

*At oral argument, the Government represented that Monsalvo had other avenues for securing a judicial determination whether he had overstayed his voluntary departure period. See Tr. of Oral Arg. 32. Monsalvo could have asked the Department of Homeland Security to return his voluntary departure bond or to adjust his immigration status; if DHS had denied the request, then Monsalvo could have sought judicial review of DHS's denial. *Ibid.*

(Slip Opinion)  OCTOBER TERM, 2024  1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## RILEY *v.* BONDI, ATTORNEY GENERAL

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 23–1270.  Argued March 24, 2025—Decided June 26, 2025

The Department of Homeland Security (DHS) sought to remove Pierre Riley, a citizen of Jamaica, from the United States under expedited procedures for aliens convicted of aggravated felonies.  On January 26, 2021, the DHS issued a "final administrative review order" (FARO) directing Riley's removal to Jamaica.  Under 8 U. S. C. §1228(b)(3), aliens may petition courts of appeals for FARO review.  While Riley did not contest his removal from the United States, he sought relief under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), telling an immigration officer that he would likely be killed by a drug kingpin if he returned to Jamaica.  The officer concluded that Riley did not demonstrate reasonable fear of persecution, but an Immigration Judge (IJ) disagreed and concluded that Riley was entitled to relief under the CAT, which prohibits removal to countries where torture is likely.  The IJ sent Riley's case to a "withholding-only" proceeding to determine whether he could be removed to Jamaica.  At that proceeding, the IJ found Riley credible and granted deferral of removal to Jamaica under the CAT.  The DHS appealed to the Board of Immigration Appeals (BIA), which vacated the IJ's order and allowed the FARO's enforcement.  Three days later, Riley filed a petition for review in the Fourth Circuit.  The Fourth Circuit dismissed Riley's petition for lack of jurisdiction, holding that (1) aliens cannot obtain review of BIA decisions in "withholding-only" proceedings by filing within 30 days of that decision, and (2) §1252(b)(1)'s 30-day filing deadline is jurisdictional, not merely a mandatory claims-processing rule.

*Held*:

  1. BIA orders denying deferral of removal in "withholding-only" proceedings are not "final order[s] of removal" under §1252(b)(1).

Syllabus

An "order of removal" includes an "order of deportation," 110 Stat. 3009–627, which, in turn, is defined as an order "concluding that the alien is deportable or ordering deportation," §1101(a)(47)(A). The FARO issued by DHS on January 26, 2021, is "the final order of removal" under the statute because it held that Riley was deportable and directed that he be removed from the United States. The order was also the Executive's *final* determination on the question of removal. An order of removal becomes final at the earlier of two points: (1) "a determination by the [BIA] affirming such order," or (2) "the expiration of the period in which the alien is permitted to" petition the BIA for review of the order. §1101(a)(47)(B). Because an alien in streamlined removal proceedings cannot seek review of his FARO before an IJ *or* the BIA, the period to seek review "expire[s]" as soon as the FARO is issued—meaning that the order becomes final immediately upon issuance.

The Court's decisions in *Nasrallah* v. *Barr*, 590 U. S. 573, and *Johnson* v. *Guzman Chavez*, 594 U. S. 523, buttress this conclusion. In *Nasrallah*, the Court noted that CAT orders are not final removal orders because they do not conclude that an alien is deportable or order deportation. 590 U. S., at 582. The Court held that CAT orders do not "disturb" or "affect the validity" of final removal orders, so they do not merge into final orders because only rulings affecting the validity of a final removal order will merge into the final order for purposes of judicial review. *Ibid. Guzman Chavez* addressed whether aliens could be released during the pendency of their withholding-only proceedings. The Court held that the directive that they be removed had become "administratively final" regardless of their pending CAT proceedings, and "the finality of [an] order of removal does not depend in any way on the outcome of the withholding-only proceedings." 594 U. S., at 533, 539–540.

The Government argues that the question in *Guzman Chavez* was whether the removal order in that case was "administratively final" for purposes of detention, not whether a removal order constitutes "the final order of removal" for purposes of filing. But this argument conflates when a petition for review must be filed with the issues that may be adjudicated in that proceeding. The Government then compares the purposes of finality in §§1252(b)(1) and 1231, arguing that the meaning differs. Although finality may serve different purposes under different statutes, it does not follow that the meaning of finality necessarily varies. The Government raises legitimate practical concerns about removal orders becoming final before withholding-only relief is decided, but the Court must follow statutory text and precedent. The text and precedents make clear that the FARO is the final order of removal, and withholding-only proceedings do not disturb the finality

Cite as: 606 U. S. ____ (2025)     3

Syllabus

of otherwise final removal orders. Pp. 5–11.

2. The 30-day filing deadline under §1252(b)(1) is a claims-processing rule, not a jurisdictional requirement.

Categorizing a rule as jurisdictional has important consequences that may disrupt the orderly and efficient adjudication of cases in the federal courts. Court precedent shows reluctance to label rules "jurisdictional" unless Congress clearly signals that intent. While Congress need not use "magic words" to indicate that a rule is jurisdictional, *Henderson* v. *Shinseki*, 562 U. S. 428, 436, the Court's recent decisions require an exceedingly strong signal for jurisdictional classification. That demanding requirement is not met here.

Section 1252(b)(1) states petitions "must be filed not later than 30 days after the date of the final order of removal." This language tells *aliens* what to do to obtain judicial review, but it provides no directives to *courts*. It does not reference jurisdiction and lacks any language "demarcat[ing] a court's power." *Harrow* v. *Department of Defense*, 601 U. S. 480, 484. The placement of the statute also suggests it is not jurisdictional because neither the particular subsection nor the broader section in which the deadline is placed concerns jurisdiction.

Precedents extending back nearly 20 years support classifying §1252(b)(1)'s deadline as a claims-processing rule. Before *Arbaugh* v. *Y & H Corp.*, 546 U. S. 500, the Court occasionally classified "nonextendable time limit[s]" as jurisdictional. *Id.*, at 510 (citing *United States* v. *Robinson*, 361 U. S. 220, 229). In *Arbaugh*, however, the Court made clear that courts should only treat statutory limitations as jurisdictional if Congress "clearly states" that they have jurisdictional consequences. *Id.*, at 515. The Court's cases since *Arbaugh* have almost uniformly found that the provisions at issue fail this demanding test. The one exception is *John R. Sand & Gravel Co.* v. *United States*, 552 U. S. 130, 138, where the Court would not overturn a "definitive earlier interpretation" of a statute as jurisdictional without clear congressional directive. There, century-old decisions held that the provision was truly jurisdictional. *Id., at* 134–135.

While *Stone* v. *INS*, 514 U. S. 386, 405, characterized §1252(b)(1)'s predecessor provision as "jurisdictional," it used the term loosely and did not "atten[d] to the distinction between 'jurisdictional' rules (as we understand them today) and nonjurisdictional but mandatory ones." *Santos-Zacaria* v. *Garland*, 598 U. S. 411, 421. Since *Stone*, the Court has repeatedly found that filing deadlines, including mandatory ones, are not jurisdictional.

Section 1252's 30-day filing rule is not jurisdictional, but because the Government does not wish to press that ground for dismissal the

4 RILEY *v.* BONDI

Syllabus

Court's holding does not preclude this case from proceeding on remand.  Pp. 11–16.

Vacated and remanded.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., THOMAS, KAVANAUGH, and BARRETT, JJ., joined in full, and in which SOTOMAYOR, KAGAN, GORSUCH, and JACKSON, JJ., joined only as to Part II–B.  THOMAS, J., filed a concurring opinion.  SOTOMAYOR, J., filed an opinion dissenting in part, in which KAGAN and JACKSON, JJ., joined in full, and in which GORSUCH, J., joined except as to Part IV.

Cite as: 606 U. S. ____ (2025)          1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

———

No. 23–1270

———

## PIERRE YASSUE NASHUN RILEY, PETITIONER *v.* PAMELA BONDI, ATTORNEY GENERAL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[June 26, 2025]

JUSTICE ALITO delivered the opinion of the Court.

In this case, we must decide whether the Court of Appeals for the Fourth Circuit erred in dismissing petitioner Pierre Riley's petition for review on jurisdictional grounds. And in order to make that decision, we must decide two subsidiary questions: (1) whether the 30-day filing deadline for judicial review of a "final order of removal," 8 U. S. C. §1252(b)(1), is a jurisdictional requirement or simply a mandatory claim-processing rule; and (2) whether an alien can obtain review of a Board of Immigration Appeals (BIA) decision in a "withholding-only" proceeding (*i.e.*, one in which removal from the United States is not at issue) by filing a petition for review within 30 days of that decision.

The answers to these questions matter in this case because Riley filed a petition for review within 30 days after a BIA order in his withholding-only proceeding but long after the issuance of a "final administrative review order" (FARO) that commanded his removal from the United States. The Court of Appeals held that Riley's petition was filed too late, and because it viewed the 30-day deadline as jurisdictional, it dismissed his petition. We now vacate and remand.

Opinion of the Court

Taking the second question first, we hold that a BIA order in a withholding-only proceeding is not a "final order of removal," and therefore the 30-day filing deadline cannot be satisfied by filing a petition for review within 30 days of the BIA's withholding-only order. Second, we hold that the 30-day filing deadline is not jurisdictional. Because the Government has chosen not to seek dismissal of Riley's case on that ground, we vacate the judgment below and remand for further proceedings.

I

In 1995, Pierre Riley, a citizen of Jamaica, entered the United States on a B–2 tourist visa that allowed him to stay for six months, but he did not depart when that time was up. 2 App. 54. He became a member of "a far-reaching and well-organized" drug trafficking gang and was convicted in 2008 for conspiracy to distribute and to possess with intent to distribute more than 1,000 kilograms of marijuana, as well as for possession of a firearm in furtherance of a drug-trafficking crime. See *United States* v. *Riley*, 2008 WL 2662277, *1–*2 (SDNY, July 7, 2008). He was sentenced to 25 years' imprisonment but was released in January 2021. *Riley* v. *Garland*, 2024 WL 1826979, *1 (CA4, Apr. 26, 2024) (*per curiam*).

Shortly thereafter, immigration authorities took Riley into custody and sought his removal. Because he had been convicted of an aggravated felony, his case proceeded along the supposedly streamlined track that Congress created in 1996. See 8 U. S. C. §1228; Antiterrorism and Effective Death Penalty Act of 1996, §440, 110 Stat. 1277–1279. Under this process, if an immigration officer concludes that an alien was convicted of an aggravated felony, the officer issues a "Notice of Intent" to deport. 8 CFR §238.1(b)(1) (2024). The alien may challenge that determination in writing within 10 days after the notice of intent is issued. §238.1(c)(1). If the immigration officer finds that the alien

Opinion of the Court

is removable, or if the alien declines to challenge removability, the officer issues a FARO specifying the country to which the alien must be deported. §§ 238.1(d)(1), (f)(2). The alien may then petition a court of appeals for review. See 8 U. S. C. § 1228(b)(3).

In this case, it was undisputed that Riley had been convicted of an aggravated felony, and therefore on January 26, 2021, the Department of Homeland Security (DHS) issued a FARO directing that Riley be sent back to Jamaica.

Riley did not contest his removal from the United States, but he resisted return to Jamaica under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (Convention or CAT), Dec. 10, 1984, S. Treaty Doc. No. 100–20, 1465 U. N. T. S. 113. Article Three of the Convention prohibits a signatory state from sending a person to another nation if "there are substantial grounds for believing that he would be in danger of being subjected to torture." The United States became a full party to the CAT in 1994, see United Nations, General Assembly, Report of the Committee Against Torture, 55 U. N. GAOR Supp. No. 55, p. 44, U. N. Doc. A/55/44 (2000), and as subsequently required by legislation, see Foreign Affairs Reform and Restructuring Act of 1998, § 2242(b), 112 Stat. 2681–822, regulations implementing the CAT's requirements were then adopted. As relevant here, these regulations prohibit the removal of an alien to a country where torture is likely. See generally 8 CFR § 208.16.

Seeking relief under the CAT, Riley told an immigration officer that a wealthy and powerful Jamaican drug kingpin had it in for Riley's family, had killed two of his cousins, was influential with the police and politicians in Jamaica, and would likely kill Riley if he was returned to any place in that country. See 2 App. 66–70. The officer concluded that Riley did not demonstrate reasonable fear of persecution, but an Immigration Judge (IJ) disagreed and therefore

sent Riley's case to what is called a "withholding-only" pro-
ceeding—that is, a proceeding at which the only issue is
whether the alien may be removed to his home country.

At Riley's withholding-only proceeding, the IJ found Ri-
ley credible and granted deferral of removal to Jamaica un-
der the CAT.  2024 WL 1826979, *1.

The DHS appealed that decision to the BIA, which found
that Riley's claim was "not supported by sufficient objective
evidence."  1 App. 50.  Accordingly, the BIA vacated the IJ's
order and thus allowed the FARO to be enforced.  2024 WL
1826979, *1.

Three days after the issuance of that order, Riley filed a
petition for review in the U. S. Court of Appeals for the
Fourth Circuit, but the court dismissed the petition for lack
of jurisdiction.  It held that the final order of removal in
Riley's case was the FARO issued on January 26, 2021, not
the later BIA order denying CAT relief.  This meant that
Riley's petition had not been filed on time, and because the
court thought that the 30-day filing deadline in §1252(b)(1)
is jurisdictional, it dismissed Riley's petition.  *Id.*, at *1–*2.

In holding that the 30-day filing deadline is jurisdic-
tional, the Fourth Circuit joined the Seventh Circuit, but its
holding conflicted with decisions of the Fifth and Ninth Cir-
cuits.  Compare *Martinez* v. *Garland*, 86 F. 4th 561, 571–
572 (CA4 2023); *F. J. A. P.* v. *Garland*, 94 F. 4th 620, 626
(CA7 2024), with *Argueta-Hernandez* v. *Garland*, 87 F. 4th
698, 705 (CA5 2023); *Alonso-Juarez* v. *Garland*, 80 F. 4th
1039, 1046–1047 (CA9 2023).  And in holding that the 30-
day filing deadline begins to run when a FARO is issued,
the Fourth Circuit joined the Second Circuit, see
*Bhaktibhai-Patel* v. *Garland*, 32 F. 4th 180, 192–194 (CA2
2022), but its decision was at odds with decisions of numer-
ous other Circuits, most of which were handed down before
our decisions in *Nasrallah* v. *Barr*, 590 U. S. 573 (2020),
and *Johnson* v. *Guzman Chavez*, 594 U. S. 523 (2021), ana-
lyzed related issues.  See *Jimenez-Morales* v. *Attorney Gen.*,

Opinion of the Court

821 F. 3d 1307, 1308 (CA11 2016); *Garcia* v. *Sessions*, 856
F. 3d 27, 35 (CA1 2017); *Bonilla* v. *Sessions*, 891 F. 3d 87,
90, n. 4 (CA3 2018); *Argueta-Hernandez*, 87 F. 4th, at 706;
*F. J. A. P.*, 94 F. 4th, at 635–636; *Alonso-Juarez*, 80 F. 4th,
at 1046; *Arostegui-Maldonado* v. *Garland*, 75 F. 4th 1132,
1142–1143 (CA10 2023); *Kolov* v. *Garland*, 78 F. 4th 911,
918–919 (CA6 2023).

We granted certiorari to resolve these two splits. *Riley* v.
*Garland*, 604 U. S. ___ (2024). Because the Government
agreed with Riley's position on both issues, we appointed
Stephen J. Hammer as *amicus curiae* to defend the judg-
ment below. 604 U. S. ___ (2024). He has ably discharged
his responsibilities.

## II

### A

Under 8 U. S. C. §1252(b)(1), a petition for review of a "fi-
nal order of removal" must be filed within 30 days of that
order. Riley and the Government argue that Riley's peti-
tion was filed on time because it was filed within 30 days of
the BIA order denying deferral of removal, and we must
therefore decide whether that order is a "final order of re-
moval." We conclude that it is not.

### 1

The statutory text speaks directly and clearly to this
question. While the Immigration and Nationality Act does
not define the term "order of removal," any statutory refer-
ence to "an order of removal" is "deemed to include a refer-
ence to . . . an order of deportation." Illegal Immigration
Reform and Immigrant Responsibility Act of 1996,
§309(d)(2), 110 Stat. 3009–627. An "order of deportation,"
in turn, is defined as an order "concluding that the alien
is deportable or ordering deportation." 8 U. S. C.
§1101(a)(47)(A). So an "order of removal" must have those
same characteristics.

We must therefore identify which order concluded that Riley is "deportable" and commanded his deportation, and it is clear that the qualifying order is the FARO issued by DHS on January 26, 2021. That order held that Riley was deportable and directed that he be removed from the United States. See 1 App. 8.

The order was also the Executive's *final* determination on the question of removal. An order of removal becomes final at the earlier of two points: (1) "a determination by the [BIA] affirming such order," or (2) "the expiration of the period in which the alien is permitted to" petition the BIA for review of the order. §1101(a)(47)(B). This statutory definition ties finality to agency review. Because an alien in streamlined removal proceedings cannot seek review of his FARO before an IJ *or* the BIA, the period to seek review "expir[es]" as soon as the FARO is issued—meaning that the order becomes final immediately upon issuance. Therefore, under a straightforward reading of the statutory text, Riley's FARO constituted "the final order of removal" in this case.

2

Our decisions in *Nasrallah* and *Guzman Chavez* buttress this conclusion. Although the ultimate issue in each of those cases differed from the question now before us, both decisions are instructive.

In *Nasrallah*, the question was whether the alien could mount a factual challenge to the denial of relief under the CAT. Because the alien had been convicted of aggravated felonies, §1252(a)(2)(C) prevented him from challenging the factual findings on the basis of which his removal had been ordered. See 590 U. S., at 576–577, 581. But the Government argued that §1252(a)(2)(C), in combination with §1252(b)(9) (the so-called "zipper clause," see *Guerrero-Lasprilla* v. *Barr*, 589 U. S. 221, 230 (2020)), also barred the alien from raising a factual challenge to his CAT order. See

Brief for Respondent in *Nasrallah* v. *Barr*, O. T. 2019, No. 18–1432, p. 35. The zipper clause provides that judicial review of any "questions of law and fact" that arise in removal proceedings may occur "only in judicial review of a final order under this section." §1252(b)(9). As the Government saw it, the zipper clause merged the disposition of the CAT claim into the final order of removal, and since the alien could not challenge the removal decision on factual grounds, the alien should also be unable to challenge the factual basis for the denial of CAT relief. See 590 U. S., at 584–585.

We disagreed. See *id.*, at 582–583. We noted that a CAT order is not a final order of removal because "it is not an order 'concluding that the alien is deportable or ordering deportation.'" *Id.*, at 582. And what is more, we held, a CAT order "does not disturb" or "affect the validity" of a final order of removal. *Ibid.* We therefore held that the BIA's CAT order "d[id] not merge into" a final order of removal for purposes of judicial review because only "rulings that affect the validity of the final order of removal" merge into that order. *Ibid.*

Our reasoning in *Guzman Chavez* was similar. The question there was whether the aliens in question could be released during the pendency of their withholding-only proceedings, and the answer to that question hinged on whether the aliens were being detained under §1226(a)(2), which allows release before an alien is ordered removed, or under §§1231(a)(1)(B) and (a)(2), which make detention mandatory after removal has become "'administratively final.'" 594 U. S., at 527–528. In *Guzman Chavez*, the aliens' removal had been ordered by DHS, and that determination was not being challenged, but proceedings in which they were seeking withholding of removal were still in progress. *Id.*, at 532.

We held that the aliens were detained under

§§1231(a)(1)(B) and (a)(2) and, as a result, could not be re-
leased. *Id.*, at 533. We reasoned that the directive that
they be removed had become "administratively final" and
that the pendency of the withholding-only proceedings did
not alter that fact. See *id.*, at 540. Withholding-only pro-
ceedings, we said, do not "affec[t]" a removal order's "valid-
ity," and an alien's initiation of such proceedings "does not
render non-final an otherwise 'administratively final' . . .
order of removal." *Ibid.* (internal quotation marks omitted).
"[T]he finality of the order of removal," we explained, "does
not depend in any way on the outcome of the withholding-
only proceedings." See *id.*, at 539.

For present purposes, the lessons taught by *Nasrallah*
and *Guzman Chavez* are clear. An order denying relief un-
der the CAT is not a final order of removal and does not
affect the validity of a previously issued order of removal or
render that order non-final. That teaching dooms Riley's
argument here.

                                3

Riley and the Government struggle to escape the reason-
ing of *Nasrallah* and *Guzman Chavez,* but their efforts are
unconvincing. Riley begins by arguing at length that in a
case like his, an order denying withholding of removal or
CAT relief should be regarded as marking the point in time
of a final order because it occurs last and enables the FARO
to be executed. See Brief for Petitioner 29–34. But as al-
ready explained, this argument runs headlong into *Nasral-
lah* and *Guzman Chavez*.

The Government, while agreeing with the court below
that a CAT or withholding-only relief order is not itself a
final order of removal, also contends that a previously is-
sued removal order cannot become final "until the conclu-
sion of withholding-only proceedings." Brief for Respondent
in Support of Petitioner 42–43. But *Guzman Chavez* makes

Opinion of the Court

clear that "the finality of [an] order of removal does not depend in any way on the outcome of the withholding-only proceedings." See 594 U. S., at 539.

The Government responds that the question in *Guzman Chavez* was whether the removal order in that case was "administratively final" for purposes of detention under §1231(a)(1)(B), not whether, as in this case, a removal order constitutes "the final order of removal" under §1252(b)(1)'s 30-day filing rule. See Brief for Respondent in Support of Petitioner 44–45. The Government notes that the language in these two provisions is not exactly the same, and it argues that there are two good reasons why the concept of finality should be seen as having different meanings under §§1252(b)(1) and 1231.

The first of these arguments analogizes review under §1252(b)(1) to an appeal from a district court's "final decisio[n]" under 28 U. S. C. §1291. See Brief for Respondent in Support of Petitioner 46. Since an appeal from a final district court decision provides the vehicle for reviewing all prior district court rulings, the Government argues that there should be a single review proceeding in a case like this. *Ibid.*

This argument conflates two separate issues: (1) when a petition for review must be filed and (2) the issues that may be adjudicated in that proceeding. We agree that there can be only one review proceeding in a case like Riley's, and we also agree with the obvious proposition that review of the denial of CAT relief cannot take place until the BIA has denied such relief. That does not mean, however, that an order denying CAT relief is the final order of removal in a case like Riley's or that a previously issued removal order remains non-final until CAT relief is denied. Instead, the only conclusion that the Government's argument supports is that review of removability and withholding of removal should occur in a single appellate proceeding.

Opinion of the Court

The Government's second argument regarding the meaning of finality in §§1252(b)(1) and 1231 rests on its understanding of the reasons why finality is important under those two provisions. Under §1252(b)(1), the Government asserts, finality is important because it marks the point at which judicial review may be sought, whereas under §1231, the finalization of administrative review is an event that heightens the risk that an alien, if not detained, will simply disappear. See *id.*, at 47.

We appreciate this difference, but just because finality may serve different purposes under different statutes, it does not follow that the meaning of finality necessarily varies. Here, Riley's argument does not provide an adequate reason to disregard the lessons of *Nasrallah* and *Guzman Chavez.*

4

The Government's final submission concerns the practical problems that it fears will arise if a removal order becomes final before the issue of withholding-only relief is decided. The Government worries that aliens like Riley who wish only to contest removal to their native country will not file a petition for review until their request for withholding of removal to that destination is denied. And if an alien files a petition for review before the question of withholding-only relief is settled, the Government fears that the proceeding in the court of appeals may be wrapped up before the BIA denies withholding-only relief, and the alien may thus be deprived of any judicial review of that denial. See Brief for Respondent in Support of Petitioner 36–38.

These are legitimate practical concerns, but we must nevertheless follow the statutory text and our prior precedents. And in any event, these problems are not unavoidable. In a case like this, the Government can inform aliens of the need to file a petition within 30 days after the issuance of a

Opinion of the Court

FARO, and it can alert the court of appeals to the pendency of a withholding-only proceeding so that review there can wait until that issue is decided. And if requests for withholding of removal in cases like Riley's are decided expeditiously—and that was the whole point of the supposedly streamlined procedure adopted by Congress to effect the quick removal of dangerous aliens\*—petitions for review of removal orders should not linger long on a court of appeals docket before the withholding issue is ready for review. Finally, if Government makes a general practice of what it has done in Riley's case, *i.e.*, declining to press for enforcement of the 30-day filing rule, aliens who are mistaken about when a petition for review must be filed will not be hurt.

In sum, the statutory text and our precedents make clear that the FARO is the final order of removal in this case, and withholding-only proceedings do not disturb the finality of an otherwise final order of removal.

### B

We turn next to the question whether §1252(b)(1)'s 30-day deadline for filing a petition for review is "jurisdictional."

This question is important because categorizing a rule as jurisdictional has important consequences that may disrupt the orderly and efficient adjudication of cases in the federal courts. Courts generally decide only the questions that are presented by the parties. See *Henderson* v. *Shinseki*, 562 U. S. 428, 434 (2011). If a party neglects to raise, concedes, or waives an issue, a court generally has no obligation to

———————

*The Government reminds us that such proceedings have often lasted many months and even years. See Brief for Respondent in Support of Petitioner 37 (citing *Martinez* v. *Garland*, 86 F. 4th 561, 574 (CA4 2023) (Floyd, J., concurring in judgment); *Johnson* v. *Guzman Chavez*, 594 U. S. 523, 552 (2021) (Breyer, J., dissenting)). That is surely not what Congress anticipated when it enacted the streamlined procedure.

Opinion of the Court

consider it. See *Wilkins* v. *United States*, 598 U. S. 152, 157–158 (2023); see also *Union Pacific R. Co.* v. *Locomotive Engineers*, 558 U. S. 67, 81–82 (2009) (noting that non-jurisdictional matters are "ordinarily forfeited if the party asserting the rule waits too long to raise the point" (internal quotation marks omitted)).

True jurisdictional requirements, however, are different. A federal court must always satisfy itself that it has jurisdiction. See *United States* v. *Kwai Fun Wong*, 575 U. S. 402, 408–409 (2015). Thus, even if the parties fail to spot a jurisdictional issue or agree that the court has jurisdiction, the court cannot proceed unless it makes an independent determination that it has jurisdiction. See *Henderson*, 562 U. S., at 434; see also 33 C. Wright & A. Miller, Federal Practice and Procedure §8316, p. 50 (2018) ("[A] litigant's failure to comply with a jurisdictional bar deprives a court of all authority to hear a case, regardless of waiver or equitable considerations." (internal quotation marks and alteration omitted)).

Relying on a string of decisions issued during the past 19 years, Riley and the Government argue that the 30-day filing deadline in §1252(b)(1) is not a jurisdictional rule but is instead a "quintessential claim-processing rul[e]." Brief for Petitioner 18 (internal quotation marks omitted); see Brief for Respondent in Support of Petitioner 18–21. *Amicus*, on the other hand, maintains that the 30-day deadline is jurisdictional, and because Riley did not file within 30 days of the final order of removal, he agrees with the Fourth Circuit that Riley's petition had to be dismissed. See Brief for Court-Appointed *Amicus Curiae* in Support of Judgment Below 15–22. Riley and the Government have the better argument on this issue.

1

Because jurisdictional rules have a unique capacity to

Opinion of the Court

disrupt the orderly adjudication of disputes, we are reluctant to label a rule "jurisdictional" unless Congress has clearly signaled that the rule is meant to have that status. See *Kwai Fun Wong*, 575 U. S., at 409–410; *Henderson*, 562 U. S., at 435–436. We have said that Congress "need not use magic words in order to speak clearly" on the question whether a provision is jurisdictional, *id.*, at 436, but our pattern of recent decisions shows that we will not categorize a provision as "jurisdictional" unless the signal is exceedingly strong.

And in this case, that demanding requirement is not met.

We start with the text of the statute. Section 1252(b)(1) provides that "[t]he petition for review must be filed not later than 30 days after the date of the final order of removal." This language tells *aliens* what they must do if they want judicial review, but it provides no directives to *courts*. It makes no reference to jurisdiction and lacks any language "demarcat[ing] a court's power." *Harrow* v. *Department of Defense*, 601 U. S. 480, 484 (2024); see *Henderson*, 562 U. S., at 438; *Kwai Fun Wong*, 575 U. S., at 411.

The placement of the 30-day filing rule also weighs against *amicus*'s argument. Neither the particular subsection nor the broader section in which the deadline is placed concerns jurisdiction, but there are other sections in which the deadline could have been housed if it had been meant to have jurisdictional status. One possibility is §1252(b)(4), which delineates the bounds of an appellate court's review authority. Another is §1252(a)(2), which is entitled "Matters not subject to judicial review." (Boldface deleted.) But Congress eschewed those logical homes for a true jurisdictional provision.

### 2

Our precedents extending back nearly 20 years support classifying §1252(b)(1)'s filing deadline as a claims-processing rule. Prior to our decision in *Arbaugh* v. *Y & H*

*Corp.*, 546 U. S. 500 (2006), we had occasionally classified "nonextendable time limit[s]" as jurisdictional. *Id.*, at 510 (citing *United States* v. *Robinson*, 361 U. S. 220, 229 (1960)). And in several other cases, we had issued what we have called "'drive-by'" jurisdictional statements—that is, we had loosely stated that "'jurisdictio[n]'" was lacking without considering whether the defect really concerned a limitation on the court's capacity to decide as opposed to a threshold requirement that a party had to satisfy in order to go forward. 546 U. S., at 511 (quoting *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 91 (1998)).

Since *Arbaugh,* however, we have been more disciplined in our use of the term "jurisdictional." In that case, we were required to decide whether satisfying Title VII's definition of a covered "employer," which turns on the number of employees in a work force, was a jurisdictional requirement. 546 U. S., at 503. In holding that this coverage requirement is *not* jurisdictional, we made clear that courts should treat a "statutory limitation" as jurisdictional only if Congress "clearly states" that the provision has jurisdictional consequences. *Id.*, at 515–516. And since *Arbaugh*, our cases have almost uniformly found that the provisions at issue failed to meet this very demanding test. See, *e.g.*, *Reed Elsevier, Inc.* v. *Muchnick*, 559 U. S. 154, 166 (2010); *Henderson*, 562 U. S., at 441–442; *Sebelius* v. *Auburn Regional Medical Center*, 568 U. S. 145, 154–155 (2013); *Kwai Fun Wong*, 575 U. S., at 410–411; *Boechler* v. *Commissioner*, 596 U. S. 199, 211 (2022); *Wilkins*, 598 U. S., at 158–159; *Harrow*, 601 U. S., at 485.

The one exception to this pattern is *John R. Sand & Gravel Co.* v. *United States*, 552 U. S. 130 (2008)—and, not surprisingly, that decision is the centerpiece of *amicus*'s argument. See Brief for Court-Appointed *Amicus Curiae* in Support of Judgment Below 17–22, 26–30. But the situation in *John R. Sand* was quite different from the situation here. In *John R. Sand*, decisions going back more than a

Opinion of the Court

century had held that the provision in question and its pre-decessors were truly jurisdictional. 552 U. S., at 134–135. They did not simply use that term but referred to the unique characteristics of jurisdictional provisions. See *Kendall* v. *United States*, 107 U. S. 123, 125–126 (1883); *Finn* v. *United States*, 123 U. S. 227, 232–233 (1887). And we held that we will not overturn a "definitive earlier interpretation" of a statute as jurisdictional unless Congress has provided a clear contrary directive. See *John R. Sand*, 552 U. S., at 137–138.

Here, *amicus* argues that *Stone* v. *INS*, 514 U. S. 386 (1995), is like the earlier jurisdictional decisions on which we relied in *John R. Sand*. In *Stone,* the Court characterized §1252(b)(1)'s predecessor as "jurisdictional," 514 U. S., at 405, and *amicus* argues that this is a "definitive interpretation" that should be accepted, see Brief for Court-Appointed *Amicus Curiae* in Support of Judgment Below 11. But we see critical differences between *Stone* and the established precedents in *John R. Sand*.

*Stone*, to be sure, did describe a predecessor provision's filing deadline as "jurisdictional." 514 U. S., at 405; see also *Henderson*, 562 U. S., at 437. As we later explained, however, *Stone* used the term "jurisdictional" loosely and did not "atten[d] to the distinction between 'jurisdictional' rules (as we understand them today) and nonjurisdictional but mandatory ones." *Santos-Zacaria* v. *Garland*, 598 U. S. 411, 421 (2023). *Stone* suggested that all mandatory filing requirements are jurisdictional, see 514 U. S., at 405, but since that time, we have repeatedly found that filing deadlines, including some couched in mandatory terms, are not jurisdictional. In *Henderson*, we unanimously held that 38 U. S. C. §7266(a)—which provides that "a person adversely affected" by a decision of the Board of Veterans' Appeals "shall file a notice of appeal . . . within 120 days"—is not a jurisdictional time bar. 562 U. S., at 441–442. We reached

the same conclusion in *Boechler*, where the provision at issue, 26 U. S. C. §6330(d)(1), set the deadline for filing a petition for review in the Tax Court. 596 U. S., at 211. And most recently, in *Harrow*, we held that 5 U. S. C. §7703(b)(1)(A), which provides that "any petition for review" of an order of the Merit Systems Protection Board "shall be filed within 60 days after the Board issues notice of the final order or decision," is non-jurisdictional. 601 U. S., at 485.

In these cases, like the present case, the statutes imposed requirements on litigants, not the courts; but even when the relevant statutory language was not litigant-focused, we have found that our clear statement rule was not satisfied. See, *e.g.*, *Kwai Fun Wong*, 575 U. S., at 410–411 (holding that 28 U. S. C. §2401(b), which provides that "[a] tort claim against the United States shall be forever barred unless it is presented . . . within two years after such claim accrues," is non-jurisdictional); *Wilkins*, 598 U. S., at 159 (holding mandatory time bar non-jurisdictional).

In sum, we hold that §1252's 30-day filing rule is not jurisdictional, but because the Government does not wish to press that ground for dismissal, it does not preclude this case from proceeding on remand.

\*    \*    \*

For these reasons, the judgment of the United States Court of Appeals for the Fourth Circuit is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 23–1270

_____

## PIERRE YASSUE NASHUN RILEY, PETITIONER *v.* PAMELA BONDI, ATTORNEY GENERAL

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[June 26, 2025]

JUSTICE THOMAS, concurring.

The Court today holds that the Fourth Circuit erred in treating the 30-day deadline in 8 U. S. C. §1252(b)(1) as jurisdictional. *Ante*, at 2. I agree and join the Court's opinion in full. I write separately to note that the Fourth Circuit may nevertheless lack jurisdiction over this suit for a different reason. Petitioner Pierre Riley sought review of an "Order of the Board of Immigration Appeals . . . entered on May 31, 2022." 1 App. 42 (emphasis deleted). Today's opinion makes clear that this May 31 order is not a "'final order of removal.'" *Ante*, at 5. Instead, it is an order denying relief under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT). Congress has specified that federal courts of appeals lack jurisdiction to review CAT orders "except *as part of* the review of a final order of removal." §2242, 112 Stat. 2681–822, note following 8 U. S. C. §1231 (emphasis added). Thus, on remand, the Fourth Circuit should consider whether it has jurisdiction to review a CAT order when the court is not conducting that review "as part of the review of a final order of removal." *Ibid.*

## I

Through a series of statutory enactments, Congress has

Thomas, J., concurring

established a comprehensive framework for "[j]udicial review of a final order of removal." 8 U. S. C. §1252(a)(1). "[A] 'final order of removal' is a final order 'concluding that the alien is deportable or ordering deportation.'" *Nasrallah* v. *Barr*, 590 U. S. 573, 579 (2020) (quoting 8 U. S. C. §1101(a)(47)(A)).

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) grants the federal courts of appeals jurisdiction to review an alien's "final order of removal." §1252(a)(1). The statute makes the filing of a "petition for review" in accordance with the procedures outlined in IIRIRA the "sole and exclusive means" for an alien to obtain judicial review of such an order. §1252(a)(5).

IIRIRA contemplates that an alien facing removal may bring a "claim" under the CAT. §1252(a)(4). The CAT is an international human rights treaty that, as relevant here, prohibits the removal of an alien to a country where the alien is likely to be tortured. CAT claims are addressed in the first instance by an immigration judge. The immigration judge's decision is appealable to the Board of Immigration Appeals, an administrative body within the Executive Branch.

This Court has made clear that "CAT orders are not the same as final orders of removal." *Nasrallah*, 590 U. S., at 582 (emphasis deleted). "An order granting CAT relief means only that, notwithstanding the order of removal, the [alien] may not be removed to the designated country of removal, at least until conditions change in that country." *Ibid.* "A CAT order is not itself a final order of removal because it is not an order 'concluding that the alien is deportable or ordering deportation.'" *Ibid.*

While IIRIRA acknowledges that an alien may bring a "claim" under the CAT, see §1252(a)(4), jurisdiction for judicial review of CAT claims comes from a different statute—the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), see §2242, 112 Stat. 2681–822, note following 8

U. S. C. §1231. FARRA specifies that no federal court shall have "jurisdiction to consider or review claims raised under the [CAT] except as part of the review of a final order of removal pursuant to [8 U. S. C. §1252]." §2242(d), 112 Stat. 2681–822; see also 8 U. S. C. §1252(a)(4) (stating that the filing of "a petition for review filed with an appropriate court of appeals in accordance with [§1252]" is the "sole and exclusive means for judicial review" of any CAT claim).

IIRIRA also contains a "zipper clause," which provides for consolidation in judicial review. The zipper clause states that "[e]xcept as otherwise provided in this section," judicial review of "all questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien" shall be "available only in judicial review of a final order under this section." §1252(b)(9). The upshot is straightforward: Federal courts generally lack jurisdiction over all questions of law and fact that arise from removal proceedings unless the court is reviewing "a final order" under §1252(a)(1) or exercising jurisdiction "otherwise provided" in §1252. §1252(b)(9).

The zipper clause plainly covers CAT claims because CAT claims "aris[e] from" removal proceedings. *Ibid.*; see also *Nasrallah*, 590 U. S., at 585. It follows that federal courts lack jurisdiction to review CAT claims "unless they are reviewing 'a final order' under §1252(a)(1) or exercising jurisdiction 'otherwise provided' in §1252." *Jennings* v. *Rodriguez*, 583 U. S. 281, 316 (2018) (THOMAS, J., concurring in part and concurring in judgment). Section 1252 does not contain "a specific grant of jurisdiction over CAT claims." *Nasrallah*, 590 U. S., at 591–592 (THOMAS, J., dissenting). FARRA—not §1252—"provides for judicial review of CAT claims." *Id.*, at 580 (majority opinion). Thus, on my reading of the relevant statutes, courts cannot review CAT claims unless they are reviewing a final order of removal.

4  RILEY *v.* BONDI

Thomas, J., concurring

## II

Riley has never petitioned for judicial review of a final order of removal. See Brief for Petitioner 10–12. He petitioned the Fourth Circuit only for "review of the Order of the Board of Immigration Appeals . . . entered on May 31, 2022." 1 App. 42 (emphasis deleted). And, as the Court today holds, this May 31 order addressing Riley's CAT claim is not a final order of removal. *Ante*, at 5.

I do not see how the Fourth Circuit has jurisdiction to review a CAT order in isolation when the petitioner does not seek review of a final order of removal. Congress has provided that federal courts of appeals lack jurisdiction to review an order denying CAT relief "except *as part of* the review of a final order of removal." §2242(d), 112 Stat. 2681–822 (emphasis added). "In other words, a final order of removal is required if a court is to review a CAT order at all." *Nasrallah*, 590 U. S., at 592 (Thomas, J., dissenting).

Riley has undoubtedly received a final order of removal. But, he has never sought judicial review of that order pursuant to the procedures outlined in §1252. This Court has held that "CAT orders may be reviewed *together with* final orders of removal in a court of appeals." *Id.*, at 581 (emphasis added). But, as far as I am aware, we have never held that judicial review of CAT orders is available when an alien does not petition for review of a final order of removal.

"[W]e can address jurisdictional issues in any order we choose." *Acheson Hotels, LLC* v. *Laufer*, 601 U. S. 1, 4 (2023); see also *Ruhrgas AG* v. *Marathon Oil Co.*, 526 U. S. 574, 584 (1999) (there is no mandatory "sequencing of jurisdictional issues"). In this case, we decide only the issue on which we granted certiorari: the correctness of the Fourth Circuit's conclusion that it lacked jurisdiction based on the timing of Riley's petition for review. We do not decide whether Riley's case is otherwise free of jurisdictional defects.

On remand, the Fourth Circuit must assure itself of its

Cite as: 606 U. S. ____ (2025)     5

THOMAS, J., concurring

jurisdiction before it can proceed to the merits of Riley's petition. See *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 101–102 (1998). I encourage the Fourth Circuit to consider whether it has jurisdiction to review a CAT order—and only a CAT order—when the petitioner does not seek review of a final order of removal.

Cite as: 606 U. S. ____ (2025)          1

SOTOMAYOR, J., dissenting in part

# SUPREME COURT OF THE UNITED STATES

————

No. 23–1270

————

## PIERRE YASSUE NASHUN RILEY, PETITIONER *v.* PAMELA BONDI, ATTORNEY GENERAL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[June 26, 2025]

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN and JUSTICE JACKSON join, and with whom JUSTICE GORSUCH joins as to all but Part IV, dissenting in part.

Sometimes, to ask a question is to answer it. When petitioner Pierre Riley received an order from the Department of Homeland Security notifying him it would seek to deport him to Jamaica, he timely sought deferral of that removal on the ground that he would likely be killed upon his return there. After initially winning such relief from an Immigration Judge, Riley lost before the Board of Immigration Appeals. The question is when Riley should have petitioned for judicial review of the Board's order. Was his petition due 30 days after the Government first notified him he would be deported, well over a year before the Board issued the order Riley sought to challenge? Or was it instead due 30 days after the order denying his claim for deferral of removal? The answer is clear: One should not be required to appeal an order before it exists.

Incomprehensibly, the Court disagrees. It acknowledges that the immigration laws required Riley to appeal the Department's decision that he was "deportable" together with the Board's (much later) order denying him relief from removal to Jamaica. It admits that the only way to review both orders is to do so after the latter of the two issues. Yet it concludes Riley's appeal was due before the Board issued

2                        RILEY *v.* BONDI

the second order.  Because Congress did not write so inco-
herent a judicial-review provision, I respectfully dissent.[1]

## I

### A

Petitioner Pierre Riley grew up in Kingston, Jamaica.  In
1995, at age 16, he entered the United States on a visitor's
visa to live with his father, a U. S. citizen.  Riley overstayed
his visa, because (he says) he thought his father had ar-
ranged for his naturalization.  Eventually, Riley got in-
volved in marijuana trafficking, and in 2008, a federal jury
convicted him of conspiring to distribute marijuana and
possessing a firearm in furtherance of that conspiracy.  For
those offenses, a Federal District Court sentenced him to 25
years' imprisonment.

In January of 2021, after serving nearly 15 years of his
sentence, Riley moved for compassionate release, arguing
that his Type 2 diabetes and the COVID–19 pandemic con-
stituted extraordinary and compelling reasons justifying
his release.  The District Court agreed.

A few days later, the Department of Homeland Security
served Riley with notice that it would seek to remove him
from the United States.  Because Riley had been convicted
of an aggravated felony, the Government could pursue his
removal "without a hearing before an immigration judge."
8 CFR §238.1(b)(2)(i) (2024); 8 U. S. C. §1228(c).  Instead,
after providing Riley an opportunity to contest his remova-
bility in writing, an immigration officer simply issued a "Fi-
nal Administrative Removal Order," finding him "deporta-
ble" and ordering him "removed from the United States t[o]
Jamaica."  1 App. 7–8.  Riley received this removal order on
January 28, 2021.

---

[1] The majority correctly holds that the deadlines in this case are not
jurisdictional, *ante,* at 11–16, so I join Part II–B of its opinion.

SOTOMAYOR, J., dissenting in part

### B

The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), Art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100–20, 1465 U. N. T. S. 113, categorically prohibits signatory states from returning any person "to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." The United States has been a party to the Convention since 1994, and federal statutes and regulations implement its requirements. See *ante,* at 3; 8 CFR §208.16(c). "A conviction of an aggravated felony has no effect on CAT eligibility" and "the Attorney General has no discretion to deny relief to a noncitizen who establishes his eligibility." *Moncrieffe* v. *Holder*, 569 U. S. 184, 187, n. 1 (2013). That is why even noncitizens like Riley, who are statutorily ineligible for administrative hearings on removability, are nonetheless entitled to a hearing before an immigration judge if they express a credible fear of torture in their country of removal. Such hearings are known as withholding-only or CAT proceedings, and their result can be appealed to the Board of Immigration Appeals. 8 CFR §208.31(e).

After receiving his removal order, Riley told an asylum officer that a powerful drug dealer affiliated with the Jamaican Government had been targeting his family and had murdered two of his cousins. 2 App. 66. Riley feared that he, too, would be killed upon his return to Jamaica. The officer found Riley "credible," but nonetheless concluded he was ineligible for CAT relief. *Id.*, at 59.

At a subsequent hearing before an Immigration Judge, Riley again testified that he feared removal to Jamaica. Riley explained that, following his compassionate release, "a big drug kingpin" who functioned as a major political leader in his Kingston neighborhood and was "tied in with all facets of law enforcement" had threatened repeatedly to kill him. Administrative Record in *Riley* v. *Garland*, No. 22–

SOTOMAYOR, J., dissenting in part

1609 (CA4), p. 194; see *id.*, at 204–207. In 2008, Riley said, the same kingpin had ordered the killing of his cousin, Oneil Spencer, after Spencer stopped "donat[ing]" money "to fund political campaigns and pay off government officials." *Id.*, at 201. When another cousin, Darrel Scott, was deported from the United States to Jamaica two years later and urged the local police to investigate Spencer's murder, he too was shot and killed. *Id.*, at 203–204.

After Riley's release made the Jamaican news, his mother, sister, and brother each began receiving a constant stream of death threats directed at Riley. *Id.*, at 207–209, 280–289. His mother reported the threats to the police, but (Riley testified) she was told that "the reason why your son is getting threats is because it's payback," that Riley was a "criminal," and that he would have to "pay for protection." *Id.*, at 208. Riley also explained that he could not evade these threats by moving elsewhere in Jamaica. As a deportee with a criminal record, Riley would be required under Jamaican law to register his address upon his return, meaning he would be easily located.

Along with his CAT application for deferral of his removal to Jamaica, Riley submitted letters from his mother, sister, brother, and stepfather corroborating his testimony. See *id.*, at 280–289. Riley also submitted Spencer's death certificate, which lists "multiple gunshot wounds" as the cause of death. *Id.*, at 292.

The Immigration Judge found Riley's testimony credible, concluded that he was more likely than not to face torture or death upon his return to Jamaica, and granted CAT deferral of removal.

### C

The Department of Homeland Security appealed the Immigration Judge's deferral order to the Board of Immigration Appeals. The Board discerned "no clear error in the Immigration Judge's credibility determination." 1 App. 47.

SOTOMAYOR, J., dissenting in part

Nevertheless, it concluded that Riley's claim was "based on the stringing together of a series of suppositions." *Id.*, at 50. Accordingly, the Board once again ordered Riley removed to Jamaica. The Board filed its order on May 31, 2022, 16 months after the first administrative removal order. Three days after the Board denied relief, Riley petitioned the Fourth Circuit for review.

On its own motion, the Fourth Circuit dismissed Riley's appeal for lack of jurisdiction. The court recognized that an order "denying CAT relief is reviewable 'as part of the review of a final order of removal.'" *Riley* v. *Garland*, 2024 WL 1826979, *2 (Apr. 26, 2024) (*per curiam*) (quoting *Nasrallah* v. *Barr*, 590 U. S. 573, 582 (2020)). By statute, noncitizens must file their "petition[s] for review" of such final removal orders "not later than 30 days," 8 U. S. C. §1252(b)(1), a deadline the Fourth Circuit believed to be "'jurisdictional and . . . not subject to equitable tolling,'" 2024 WL 1826979, *1. The court concluded this 30-day window began to run on the date the original order of removal issued in January 2021, regardless of whether the associated CAT proceedings had concluded. By that logic, Riley would have been required to file his appeal of both the January 2021 final order of removal and the Board's May 2022 order denying CAT relief in February of 2021. Because he did not, the Fourth Circuit dismissed the appeal. *Ibid.*

## II

Should Riley have appealed the Board's order denying deferral of removal before the Board issued it? The answer ought to be easy. Yet the majority today renders the statute incoherent, holding that Riley should have appealed the order one year and three months before the Board entered it.

According to the majority, "statutory text and our prior precedents" require this absurd result. *Ante,* at 10. Our Nation's immigration laws may be complex, but the irrational scheme the Court endorses today is a product entirely

of its own creation. Statutory text and precedent over-
whelmingly confirm what common sense tells us: Riley's ap-
peal was timely.

A

Although the majority purports to be bound by the stat-
ute, its cursory analysis elides all but one of the relevant
provisions. *Ante,* at 5–6. Background on the statutory
scheme is accordingly necessary to understanding why the
question in this case arises.

Early versions of the Immigration and Nationality Act
granted the courts of appeals exclusive jurisdiction to re-
view "all final orders of deportation," Act of Sept. 26, 1961,
§5(a), 75 Stat. 651, an undefined term this Court inter-
preted to include "order[s] denying suspension of deporta-
tion," *Foti* v. *INS,* 375 U. S. 217, 222 (1963). Under that
framework, a noncitizen who received an order denying re-
lief from removal (such as the Board's order denying Riley's
CAT claim) could have appealed it as a standalone order of
deportation, regardless of whether a prior order had re-
solved the issue of removability. Cf. *Cheng Fan Kwok* v.
*INS,* 392 U. S. 206, 211 (1968) (allowing separate petitions
for review of "denials of discretionary relief" following an
initial removal order).

A number of amendments intended to streamline the im-
migration laws changed that analysis. See *Kolov* v. *Gar-
land,* 78 F. 4th 911, 922–924 (CA6 2023) (Murphy, J., con-
curring) (describing these developments). Specifically,
Congress "'consolidate[d] judicial review of immigration
proceedings into one action in the court of appeals.'"
*Guerrero-Lasprilla* v. *Barr,* 589 U. S. 221, 230 (2020) (quot-
ing *INS* v. *St. Cyr,* 533 U. S. 289, 313 (2001)). It did so by
enacting the so-called zipper clause, *ibid.,* which channels
judicial review of all claims "arising from any action taken
or proceeding brought to remove an alien from the United
States" into a single appeal: the appeal of a "final order [of

removal],'" 8 U. S. C. §1252(b)(9); see also §1252(a)(1). The zipper clause does not change the substance of what noncitizens may appeal. *Monsalvo Velázquez* v. *Bondi*, 604 U. S. ___, ___, and n. 1 (2025) (slip op., at 11, and n. 1). Rather, it ensures that "a noncitizen's various challenges arising from the removal proceeding" are "'consolidated in a petition for review and considered by the courts of appeals.'" *Nasrallah*, 590 U. S., at 580.

"Importantly," the Foreign Affairs Reform and Restructuring Act of 1998 expressly "provides for judicial review of CAT claims." *Id.*, at 580. Thus, noncitizens (including those whose opportunities for judicial review are otherwise limited on account of criminal convictions) can obtain judicial review of orders denying CAT relief. *Id.*, at 580–581. Because such challenges "aris[e]" out of the removal proceedings, however, the zipper clause applies to them. §1252(b)(9). And the zipper clause would not achieve its goal, of "[c]onsolidat[ing]" the relevant appeals, *ibid.*, if noncitizens had to appeal each issue separately. That is why, as the Act directs, "a petition for review filed with an appropriate court of appeals in accordance with" the statute governing final orders of removal "shall be the sole and exclusive means for judicial review of any cause or claim under the [CAT]." §1252(a)(4). A petition for review under §1252, in turn, "must be filed not later than 30 days after the date of the final order of removal." §1252(b)(1).

All this explains why, though Riley seeks to appeal the denial of CAT relief and not the finding that he is removable, the appellate deadline in his case nonetheless depends on identifying the "order of removal" and determining when it became "final." *Ibid.*

An "order of removal" is the same as an "'order of deportation.'" *Nasrallah*, 590 U. S., at 579, 584. Along with the other 1990s amendments, Congress enacted a statutory definition of that term, defining it as the order "concluding that the alien is deportable or ordering deportation."

8                    RILEY *v.* BONDI

§1101(a)(47)(A).  Subsequently, this Court held that a CAT order "is not itself a final order of removal" as defined in the statute.  *Id.*, at 582.  In light of that holding, the majority correctly identifies the relevant "order of removal" as the January 2021 administrative order holding Riley removable.

The only question, then, is when that order became final for purposes of the 30-day appeal window.

### B

Riley's order of removal did not became final, for purposes of appeal, until the Board issued its order denying CAT relief.  Congress expressly provided for judicial review of "any cause or claim" under CAT.  §1252(a)(4).  Self-evidently, such review "cannot take place until the [Board] has denied . . . relief."  *Ante*, at 9.  Meanwhile, Congress directed that CAT orders must be appealed alongside the underlying order of removal.  The only way to adhere to both instructions is to hold that removal orders do not become final until withholding-only proceedings are complete.  Centuries of precedent on finality confirm that conclusion.

### 1

Immigration laws define finality, but only with respect to orders of removal subject to direct Board review.  Congress provided that orders of removal "shall become final upon the earlier of . . . (i) a determination by the Board of Immigration Appeals affirming such order; or (ii) the expiration of the period in which the alien is permitted to seek review of such order by the Board of Immigration Appeals." §1101(a)(47)(B).  Sensibly, then, the statute ties finality to the close of the relevant agency proceedings.

In the mine run of cases, an immigration judge hears claims about removability together with claims about protection from or deferral of removal (such as CAT claims) in a single proceeding, which ends in a consolidated appeal to

SOTOMAYOR, J., dissenting in part

the Board. The finality provision makes clear that, in those cases, the underlying removal order becomes final once the Board has concluded its review.

Expedited removal orders like the one issued in Riley's case, however, are not subject to Board review at all. §1228(b). Rather, a noncitizen subject to expedited removal can appeal only a withholding claim to the Board, and not the removal order itself. By its plain terms, the statute's finality provision does not apply to such removal orders. That is because, in such cases, there will never be "a determination by the Board" affirming the removal order, nor is there any "period in which the alien is permitted to seek review" of it. §1101(a)(47)(B). Thus, the statutory definition alone does not resolve this case.

The majority claims the statutory definition renders the order of removal final immediately upon its issuance. That is so, the majority says, because when a removal order is not appealable, "the period to seek review [of it] 'expire[s]' as soon as the [order] is issued." *Ante,* at 6. In other words, the majority treats a nonexistent appeals period as if it were merely an infinitesimally short period, one so short as to "expir[e]" instantaneously.

That makes no sense. "Expiration," after all, means the "conclusion [or] termination of a limited time." See Webster's New Twentieth Century Dictionary 645 (2d ed. 1979); Black's Law Dictionary 579 (6th ed. 1990) ("Cessation; termination from mere lapse of time, as the expiration date of a lease, insurance policy, statute, and the like"); Black's Law Dictionary 722 (12th ed. 2024) ("The ending of a fixed period of time"). A period of time cannot "expire" if it never begins in the first place. For example, a statute fining those who apply for a driver's license after "the expiration of the period" for which they hold the license plainly would not apply to a first-time applicant. As to that applicant, there is no "period" (much less a limited or fixed one) that could "expir[e]." 8 U. S. C. §1101(a)(47)(B)(ii). So too here.

The majority gives no argument for reaching the opposite conclusion. It stands alone, moreover, in asserting that a "straightforward reading of the statutory text" resolves this case. *Ante,* at 6. Even the courts of appeals that have attempted to defend the majority's position admit that "[t]he definition of finality in §1101(a)(47)(B) does not squarely apply" to expedited orders of removal because noncitizens "may not appeal [those] decision[s] to the BIA (or even to an immigration judge)." *Bhaktibhai-Patel* v. *Garland*, 32 F. 4th 180, 192 (CA2 2022); *Martinez* v. *Garland*, 86 F. 4th 561, 568 (CA4 2023) ("An alien cannot appeal an immigration officer's reinstatement decision to the Board, so at first blush the definition appears inapposite").

### 2

Absent an unambiguous answer in the statute's definition of finality, the Court should turn to tools of statutory construction: the "'ordinary or natural' meaning" of the term "final," *Leocal* v. *Ashcroft*, 543 U. S. 1, 9 (2004), "'"the legal tradition and meaning of centuries of practice"'" associated with finality, *Lackey* v. *Stinnie*, 604 U. S. ___, ___ (2025) (slip op., at 5), and the relevant provisions' "'place in the overall statutory scheme,'" *West Virginia* v. *EPA*, 597 U. S. 697, 721 (2022).

Beginning with the ordinary meaning of "final," this Court has previously recognized that term "clearly denotes some kind of terminal event." *Smith* v. *Berryhill*, 587 U. S. 471, 479 (2019). Thus, an order becomes "final" when it "'leav[es] nothing to be looked for or expected,'" when it "'leav[es] no further chance for action, discussion, or change.'" *Ibid.*, and n. 8 (quoting 5 Oxford English Dictionary 920 (2d ed. 1989) and Webster's New World College Dictionary 542 (5th ed. 2016)).

Of course, an order can be terminal in one sense and not another. Consider a conviction. Once a jury delivers, and the court enters, a guilty verdict, nothing remains "to be

looked for or expected" from that court with respect to the conviction. In that sense, a conviction is as final as its gets. Nevertheless, "appellate review" is prohibited "until conviction and imposition of sentence." *Flanagan* v. *United States*, 465 U. S. 259, 263 (1984). So for purposes of appeal, a conviction remains nonfinal until sentencing is complete as well. Yet another rule of finality applies to the availability of collateral review. See *Jimenez* v. *Quarterman*, 555 U. S. 113, 119 (2009) (noting that, under 28 U. S. C. §2244(d)(1)(A), a state-court conviction is not final for purposes of federal collateral review until the end of direct review or of the time for seeking such review).

This multiplicity of finality rules makes clear that it is not enough to muse about finality in the abstract. Rather, the Court must focus on the specific sense of finality relevant here, which (all agree) is finality for purposes of appeal. Because "'[f]inality as a condition of review is an historic characteristic of federal appellate procedure,'" *Flanagan*, 465 U. S., at 263, centuries of precedent and practice inform that analysis.

As a general matter, an order is final for purposes of appeal "when the district court disassociates itself from the case, leaving nothing to be done at the court of first instance save execution of the judgment." *Clay* v. *United States*, 537 U. S. 522, 527 (2003). That understanding of finality serves one central purpose: preventing piecemeal litigation. As this Court put it long ago, "[f]rom the very foundation of our judicial system," rules of finality have ensured that "the whole case and every matter in controversy in it" is "decided in a single appeal." *McLish* v. *Roff*, 141 U. S. 661, 665–666 (1891). That is why this Court's finality jurisprudence is grounded "not in merely technical conceptions of 'finality,'" but rather in the policy "against piecemeal litigation." *Catlin* v. *United States*, 324 U. S. 229, 233–234 (1945).

The reason for that focus is simple: The only way to en-

sure that orders are appealed together is to have them be-
come final together as well. Otherwise, an expiring dead-
line on an earlier order (say, a conviction) would force indi-
viduals to appeal that order before the remaining issues in
the case (say, a criminal sentence) have been resolved. So
when two orders must be consolidated into the same appeal,
it follows inescapably that they become final together, as
well. Whether a ruling is final for purposes of appeal there-
fore depends principally on whether that ruling can, con-
sistent with the policy against piecemeal review, be ap-
pealed independently. See *Gillespie* v. *United States Steel
Corp.*, 379 U. S. 148, 152–153 (1964) (collecting cases).

An example illustrates the point. Sometimes, a dispute
over an award of attorney's fees follows the conclusion of
litigation on the merits. At present, "[t]here is no question
that awards of attorney's fees may be appealed separately
as final orders after a final determination of liability on the
merits." *García-Goyco* v. *Law Environmental Consultants,
Inc.*, 428 F. 3d 14, 18 (CA1 2005). Thus, for example, when
a party loses a civil case at trial, it may appeal the jury ver-
dict before the fee litigation has concluded. See *Sprague* v.
*Ticonic Nat. Bank*, 307 U. S. 161, 168–169 (1939). Because
separate appeals are permitted, the finality of the merits
judgment does not depend on the status of the attorney's
fees dispute.

Suppose, now, that Congress passed a law providing that
an appeal from final judgment "shall be the sole and exclu-
sive means for judicial review of" an order awarding attor-
ney's fees. Cf. 8 U. S. C. §1252(a)(4). That law should have
the effect of overruling the courts' present assessment that
such orders are best appealed separately. Courts would un-
doubtedly recognize that merits judgments could no longer
become final while fee litigation remained pending, because
a statute now directs otherwise. The perceived need for
separate appealability was, after all, the basis for the prior
finality rule. Keeping the old finality rule in place in the

face of the hypothetical statute, moreover, would force litigants to choose between appealing the merits judgment on time, thus forgoing their appeal of any eventual fee award, or filing their only appeal late.  No court would adopt such a scheme.

Yet that is precisely what the Court does today with respect to appeals from CAT orders.  Recall that withholding-only decisions (which now include CAT orders) once were independently appealable as orders of deportation.  See *supra*, at 6.  Congress then enacted §1252(a)(4), which says that "a petition for review" under the section governing final orders of removal "shall be the sole and exclusive means for judicial review of any cause or claim under the [CAT]." In other words, Congress directed that appeals from orders of removal and CAT orders be "'consolidated in a [single] petition for review.'"  *Nasrallah*, 590 U. S., at 580.  That should only mean one thing.  Because a statute ties appeals of the CAT order to appeals of the removal order, their finality should be tied together, too.  Accordingly, the order of removal in this case should become final, for purposes of appeal, only after the Board issued its order denying CAT relief.

### 3

That the majority nonetheless adopts the opposite position, contrary to every one of this Court's finality precedents, might suggest there is reason to doubt that CAT orders are appealable at all.  Yet statutory text and this Court's precedent are crystal clear on this point: Congress provided for judicial review of CAT claims.

Section 1252(a)(4) provides that "a petition for review" under that section "shall be the sole and exclusive means for judicial review of any cause or claim under the [CAT]." No "exclusive means" for review would be possible if review were unavailable.  That is why this Court held in *Nasrallah*

that "a noncitizen may obtain judicial review of . . . CAT or-
ders," 590 U. S., at 583, even as the dissent complained that
the Court wrongly "view[ed] §1252(a)(4) as a specific grant
of jurisdiction over CAT claims." *Id.*, at 591 (THOMAS, J.,
dissenting).

Perhaps the idea is that noncitizens may seek judicial re-
view of their CAT claims only if, by luck or happenstance,
they also have a challenge to the underlying order of re-
moval. The majority's finality rule, however, prevents CAT
appeals even under those circumstances. After all, courts
will likely finish reviewing the removal order before the
Board ever hears the associated CAT claim. Section
1252(a)(4) also does not direct courts to limit review of CAT
claims in this way; it simply requires that review of the two
kinds of orders be consolidated. Nor would this reading
make any sense. Consider its effect on the attorney's fees
hypothetical, where that reading would mean litigants
could appeal a fee award only if, by luck or happenstance,
they also had a meritorious challenge to the unrelated mer-
its judgment.

Importantly, this Court rejected a nearly identical argu-
ment about §1252 just months ago. In *Monsalvo Velázquez*,
the Government argued that noncitizens seeking judicial
review of questions arising out of their orders of removal
could do so only by challenging their removability. 604
U. S., at ___–___ (slip op., at 8–9); see also *id.*, at ___
(BARRETT, J., dissenting) (slip op., at 3) ("[J]udicial review
is available under §1252(a)(1) only if there is a challenge to
a 'final order of removal'"). This Court held that, "[i]nstead,
§1252 authorizes courts to review 'final order[s] of removal'
*and* address 'questions of law . . . arising from' them." *Id.*,
at ___–___ (slip op., at 9–10) (quoting §§1252(a)(1), (b)(9);
emphasis added). *Nasrallah*, the zipper clause, and
§1252(a)(4) each make clear that questions about one's eli-
gibility for CAT relief are questions "arising from" the order
of removal. Thus, "§1252 authorizes courts to review" such

SOTOMAYOR, J., dissenting in part

questions. *Id.*, at ___ (slip op., at 9).

Under the "'well-settled' and 'strong presumption'" favoring judicial review, "when a statutory provision 'is reasonably susceptible to divergent interpretation, we adopt the reading that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review.'" *Guerrero-Lasprilla*, 589 U. S., at 229. "The presumption can only be overcome by 'clear and convincing evidence' of congressional intent to preclude judicial review." *Ibid.*; see also *Bowen* v. *Michigan Academy of Family Physicians*, 476 U. S. 667, 670 (1986) ("'[J]udicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress'"(quoting *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 140 (1967))). It is hard to imagine any plausible reading of §1252(a)(4) on which it cuts off judicial review of CAT claims (either completely or in the arbitrary sense rejected in *Monsalvo Velázquez*), much less a "'clear and convincing'" one. *Guerrero-Lasprilla*, 589 U. S., at 229; see also *Parrish* v. *United States*, 605 U. S. ___, ___ (2025) (slip op., at 7) (reiterating this Court's consistent holdings "that 'decisions on the merits' ought not be 'avoided on the basis of . . . mere technicalities'" (quoting *Foman* v. *Davis*, 371 U. S. 178, 181 (1962))).

The majority, perhaps aware of precedent's constrains, does not dispute any of this. It acknowledges, as it must, that CAT claims are reviewable. *Ante,* at 10–11. Yet once the majority accepts that premise, it is left with no way to justify its construction of the judicial-review provision as requiring petitions for review to be filed well before the relevant CAT orders are issued. If judicial review is available, then it must be available after the relevant order is issued and not before. And if review is available after the relevant orders issue, then there is no conceivable reason to require applicants to file their petitions beforehand.

### III
#### A

Besides its halfhearted attempt to invoke the inapplicable statutory definition, the majority offers a single thought about the dispositive issue of finality. The original order, it says, "was . . . the Executive's *final* determination on the question of removal," so it "constituted 'the final order of removal' in this case." *Ante,* at 6. The implication is that, because this order was a "*final* determination," *ibid.*, it became final the moment it was issued.

This argument conflates two different questions: when the agency made its final decision on the question of removability, and when the "order of removal" became final for appellate purposes. This Court explained just months ago that "a finding of 'removability'" is only "one term in a final order of removal." *Monsalvo Velázquez*, 604 U. S., at ___ (slip op., at 9). That the agency's removability finding is final therefore does not mean that the order containing it is final for purposes of appeal.

The majority's skewed reasoning betrays a fundamental misunderstanding of the final-judgment principle. Every interlocutory order finally determines the limited question it decides, but of course that does not mean every order becomes instantly final for purposes of appeal. When a district court declines to certify an expert witness, that is its final word on the matter, yet the order remains nonfinal for purposes of appeal until the entire case has been litigated to judgment. When a district court disqualifies a litigant's counsel, that order is the court's "*final* determination on the question" of disqualification, *ante,* at 6; counsel could not show up to trial again the next day. Yet the order remains nonfinal for purposes of appeal until the underlying case is over. See *Richardson-Merrell Inc.* v. *Koller*, 472 U. S. 424, 430 (1985); *Flanagan*, 465 U. S., at 263. Few decisions, moreover, are more final than a guilty verdict, yet a convic-

tion remains nonfinal for purposes of appeal until the district court has pronounced a sentence. See *supra*, at 11.

In failing to recognize as much, the majority breaks with basic principles of finality and appellate review, holding (seemingly for the first time) that two orders that statutorily must be appealed together nonetheless do not become final together. Inexplicably, the majority admits that "review of removability and withholding of removal should occur in a single appellate proceeding," and that "review of the denial of CAT relief cannot take place until the [Board] has denied such relief." *Ante*, at 9. Yet it refuses to accept the inevitable conclusion: If the orders must be reviewed "in a single appellate proceeding," *ibid.*, then they become final for purposes of appeal together as well. The result: Noncitizens facing expedited removal will be forced to file immediate appeals of their removal orders in every case, simply to protect their right to judicial review in the event they lose their ongoing withholding-only proceedings.

Across a wide variety of statutory contexts, courts have recognized that protective appeals are "procedural hoops" that "serve no function." *West Penn Power Co.* v. *EPA*, 860 F. 2d 581, 585, 586 (CA3 1988) (explaining, in Clean Air Act case, the need "to avoid a de facto requirement of protective appeals"); *Outland* v. *CAB*, 284 F. 2d 224, 227–228 (CADC 1960) (declining to read the Administrative Procedure Act to require protective appeals while reconsideration is pending); *Newark, New Castle and Seaford, Del.* v. *FERC*, 763 F. 2d 533, 544–545 (CA3 1985) (same, in Federal Power Act case); *Rosler* v. *Derwinski*, 1 Vet. App. 241, 245–246 (1991) (explaining, in Veterans Judicial Review Act case, that reading protective appeal requirement into statute "would . . . pose a substantial administrative problem" and cause "many" claimants to "lose their right to judicial review"). Protective appeal requirements "set a trap for the unwary, who, if they are not intimately familiar with the intricacies of the finality doctrine, may inadvertently lose their right

to judicial review." *West Penn Power Co.*, 860 F. 2d, at 585.

For that reason, too, this Court has rejected statutory readings that would result in similar protective-appeal requirements, even in the face of seemingly contrary textual commands. Consider §704 of the Administrative Procedure Act, which provides: "Except as otherwise expressly required by statute, agency action otherwise final is final for purposes of this section whether or not there has been presented or determined an application . . . for any form of reconsideration." 5 U. S. C. §704. Taken literally, "[t]his would seem to mean that the pendency of reconsideration motions does not render [agency] orders nonfinal for purposes of triggering the Hobbs Act limitations period." *ICC* v. *Locomotive Engineers*, 482 U. S. 270, 284 (1987). Yet "[t]hat language has long been construed by this and other courts merely to relieve parties from the *requirement* of petitioning for rehearing before seeking judicial review . . . but not to prevent petitions for reconsideration that are actually filed from rendering the orders under reconsideration nonfinal." *Id.*, at 284–285; see also *American Farm Lines* v. *Black Ball Freight Service*, 397 U. S. 532, 541 (1970). By contrast, in *Stone* v. *INS*, 514 U. S. 386 (1995), we held that motions to reopen orders of removal did not render nonfinal the underlying removal order, precisely because petitioners "[c]ould file a separate petition to review that second final [reconsideration] order." *Id.*, at 395.

More recently, this Court has twice refused to read a protective-appeal requirement into §1252. In *Santos-Zacaria* v. *Garland*, 598 U. S. 411 (2023), the Government advanced a reading of that section that would "flood the Board with reconsideration motions that noncitizens otherwise would not file" and "flood the courts with pointless premature petitions," filed simply to preserve the right to review. *Id.*, at 429. This Court declined to "render the statutory scheme incoherent" in that way. *Id.*, at 428. And ear-

lier this year, the Government argued that, under the zipper clause, noncitizens could challenge the terms of their removal order only if they "press[ed] a challenge to [the] finding of 'removability.'" *Monsalvo Velázquez*, 604 U. S., at ___ (slip op., at 9). This Court rejected that argument, too, noting it would have put noncitizens to the choice of "either adorn[ing] their judicial petitions with a pointless challenge . . . or forfeit[ing] the right to review altogether." *Ibid.* Mere months later the Court seems to have forgotten all these lessons.

### B

The Court overlooks *Santos-Zacaria*, *Monsalvo Velázquez*, and the wealth of precedent on finality, claiming instead that two other cases are "instructive" and require a different outcome here. *Ante,* at 6. Neither case supports the majority's conclusion.

First, the majority points to *Nasrallah*'s holding that "a CAT order is not a final order of removal," does not disturb or affect the validity of a final order of removal, and does not merge into such an order. *Ante,* at 6–7. The majority does not explain, however, why this holding supports its conclusion. An order need not "'affect the validity'" of a decision (or merge into it) to impact its finality for purposes of appeal. *Ante,* at 7. As noted, a sentence does not affect the validity of a conviction (and the two do not "merge"), yet a conviction cannot be final for purposes of appeal until the sentence is final as well. Notably, *Nasrallah* itself compared the relationship between removal and CAT orders to that between a criminal conviction and sentence. 590 U. S., at 583. *Nasrallah* is therefore hardly dispositive here.

In any event, it should be clear by now that the majority's discussion of *Nasrallah* misses the point. Whether CAT orders disturb or affect the substance of removal orders would certainly be relevant if the Court conducted its finality analysis without guidance from Congress, as it did in the

case of fee awards.  See *Trustees* v. *Greenough*, 105 U. S.
527, 531 (1882) (fee orders are "so far independent" of the
merits "as to make the decision substantially a final decree
for the purposes of an appeal").  But here, Congress dictated
that the two orders must be consolidated for purposes of ap-
peal.  8 U. S. C. §1252(a)(4).  The Court is required to re-
spect that decision and move on.

The majority next points to *Johnson* v. *Guzman Chavez*,
594 U. S. 523 (2021), as supporting its conclusion.  *Ante,* at
7–8.  That case concerned the 90-day removal period follow-
ing an order of removal, during which the Government is
required to detain noncitizens.  See §1231(a)(2).  The point
of such detention is to provide the Government with a rea-
sonable period of time to "secure [the noncitizen's] re-
moval."  *Zadvydas* v. *Davis*, 533 U. S. 678, 699 (2001).  The
removal period does not begin, Congress has specified, until
the removal order is "administratively final."
§1231(a)(1)(B)(i).  The question was whether ongoing with-
holding-only proceedings prevented a removal order from
being administratively final for purposes of the mandatory
detention period.

This Court held that the administrative finality of an or-
der of removal "does not depend in any way on the outcome
of the withholding-only proceedings."  *Guzman Chavez*, 594
U. S., at 539.  Thus, the detention period begins after the
agency has finalized its removability finding, not after fur-
ther proceedings over the specific country of removal have
concluded.  *Id.*, at 534–535.  Yet whether an order is "ad-
ministratively final" for purposes of detention and whether
it is "final" for purposes of appeal are two entirely different
questions.  "Finality is variously defined; like many legal
terms, its precise meaning depends on context."  *Clay*, 537
U. S., at 527.  That is why this Court recognized in *Guzman
Chavez* that §1252 "uses different language than §1231 and
relates to judicial review of removal orders rather than de-

tention." 594 U. S., at 535, n. 6. The Court thus "express[ed] no view on" the question of finality for purposes of appeal. *Ibid.*

Nor is it at all surprising that "administratively final" in §1231 and "final" in §1252 should have different meanings. "In a given statute, the same term usually has the same meaning and different terms usually have different meanings." *Pulsifer* v. *United States*, 601 U. S. 124, 149 (2024). Because the point of detention is to ensure that a noncitizen does not flee pending his deportation, moreover, arguably all that matters for purposes of the detention statute is that the noncitizen is removable from the United States, not whether he is removable to any particular country. *Guzman Chavez*, 594 U. S., at 536, 539. There is "no reason to import the understanding of finality that applies" to detention into the separate "field" of appellate review. *Waetzig* v. *Halliburton Energy Services, Inc.*, 604 U. S. ___, ___ (2025) (majority opinion of ALITO, J.) (slip op., at 9) (discussing the different "role[s]" of finality across contexts). Indeed, precisely the same two senses of finality apply to criminal convictions. A conviction becomes final for purposes of presentencing detention once the jury has delivered its verdict. 18 U. S. C. §3143(a). Yet it does not become final for purposes of appeal until the district court has imposed a sentence.

The majority claims to "appreciate th[e] difference" between the two sorts of finality. *Ante,* at 10. But, the majority explains, "the meaning of finality" is not "necessarily" different, even when Congress uses different words to serve different purposes. *Ibid.* That truism hardly helps. The majority gives up shortly afterward, simply asserting by *ipse dixit* that the differences do not matter here. In light of 8 U. S. C. §1252(a)(4) and our finality precedents, they clearly should.

## IV

Today's holding deals untold damage to basic principles

of finality and judicial review. Time will tell whether the Court will extend its illogic beyond politically disfavored noncitizens. Cf. *McLaughlin Chiropractic Associates, Inc.* v. *McKesson Corp.*, ___ U. S. ___, ___, n. 4 (2025) (slip op., at 11, n. 4) (recognizing "unfairness . . . potentially ris[ing] to the level of a constitutional due process problem," of rule that would require regulated businesses to seek judicial review before the applicability of an agency order to them was "reasonably foreseeable").

As it stands, the chaos the majority causes to our system of immigration appeals is considerable. The effects on noncitizens subject to expedited removal proceedings should by now be clear enough. The majority suggests a number of workarounds for that chaos, including by allowing protective appeals and notice about the need to file such appeals long before CAT proceedings have concluded. See *ante,* at 10–11. To be clear, the Government is obligated by the Fifth Amendment's Due Process Clause to provide noncitizens with adequate notice about the need for an immediate appeal to preserve the right to judicial review of CAT claims. See *A. A. R. P.* v. *Trump*, 605 U. S. ___, ___ (2025) (*per curiam*) (slip op., at 3) ("'[T]he Fifth Amendment entitles aliens to due process of law in the context of removal proceedings'" (quoting *Trump* v. *J. G. G.*, 604 U. S. ___, ___ (2025) (*per curiam*) (slip op., at 3); alteration in original)). That guarantee includes "notice that is 'reasonably calculated, under all the circumstances,'" to enable "'interested parties'" to "pursue appropriate relief." *A. A. R. P.*, 605 U. S., at ___–___ (slip op., at 3–4) (quoting *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U. S. 306, 314 (1950)). So too, courts of appeals should not arbitrarily decline to hold in abeyance any premature appeals of yet-to-be-decided withholding claims. See *ante,* at 10.

In addition, the courts of appeals should consider applying standard principles of equitable tolling, which are likely available now that the Court has recognized that

SOTOMAYOR, J., dissenting in part

§1252(b)(1)'s appeal deadline is not jurisdictional. See *ante,* at 11–16.

Today's decision may have consequences beyond expedited removal proceedings, too. Recall that, in the typical case, an immigration judge decides all questions related to both removal and withholding in the same proceeding. See *supra*, at 8–9. The Board of Immigration Appeals then reviews all aspects of the immigration judge's decision. As things stand today, the noncitizen may petition for review of the Board's decision once agency review has completed. See *ibid.*; §1101(a)(47)(B). Yet what if the Board affirms "an immigration judge's removability finding but remand[s] for further consideration of withholding claims"? *Kolov*, 78 F. 4th, at 927 (Murphy, J., concurring). Would the majority hold as well that such findings become final before the remand is concluded, requiring noncitizens to file premature protective appeals whenever a CAT claim is remanded? As with so much else, the majority does not say. To avoid further chaos, the Board would be well counseled to remand cases in their entirety.

Finally, lest one think today's decision will at least allow the Government to conduct its immigration policies more cheaply or efficiently, even that is not the case. It is not by accident that the Government, across the past and present administration, stands firmly with Riley here, even as it rarely fails to press colorable jurisdictional objections. See *Diamond Alternative Energy, LLC* v. *EPA*, ___ U. S. ___, ___ (2025) (slip op., at 5). As the Government knows, "[a] whole train of unnecessary consequences" follows from requiring noncitizens to appeal in every expedited removal case, simply to protect their eventual right to appeal future withholding-only decisions. *Outland*, 284 F. 2d, at 228. In each of these unnecessary appeals, "the Board and other parties may be called upon to respond and oppose the motion for review; when the Board acts, the petition for review

24                          RILEY *v.* BONDI

must be amended to bring the petition up to date," or dismissed if the Board grants the noncitizen's CAT claim. *Ibid.* All the while, courts must manage countless cases that otherwise might never have been opened. The Government recognizes all these consequences. Brief for Respondent 36–38. This Court is blind to them. Today's decision is the rare holding that benefits no one.

\*      \*      \*

Not long ago, this Court described delays in regulatory approvals of construction projects as "'borde[ring] on the Kafkaesque.'" *Seven County Infrastructure Coalition* v. *Eagle County*, 605 U. S. ___, ___ (2025) (slip op., at 13). In holding that Riley was required to file his appeal 16 months before the order he sought to challenge existed, the Court surely moves from the border well into the heartland of illogic and absurdity. Respectfully, I dissent.